KELLUM, Judge.
Nathaniel Shaw appeals the circuit court’s summary dismissal of his petition for postconviction relief filed pursuant to Rule 32, Ala. R.Crim. P., in which he at *749 tacked his 2009 convictions for one count of first-degree theft of property, one count of unlawful possession of cocaine, one count of trafficking in stolen identities, and four counts of second-degree criminal possession of a forged instrument, and his resulting sentences, as a habitual offender, of 27 years’ imprisonment for each of the first-degree-theft and trafficking-in-stolen-identities convictions, and 10 years’ imprisonment for the possession-of-cocaine conviction and each of the possession-of-a-forged-instrument convictions. This Court affirmed Shaw’s convictions and sentences on appeal in an unpublished memorandum issued on April 16, 2010. Shaw v. State (No. CR-08-1340), 77 So.3d 624 (Ala.Crim. App.2010) (table). The Alabama Supreme Court denied certiorari review, and this Court issued a certificate of judgment on December 10, 2010.
Shaw filed this, his first, Rule 32 petition on August 8, 2012. In his petition, Shaw alleged:
(1) That the trial court lacked jurisdiction to render the judgments or to impose the sentences because, he said, he was incompetent to stand trial;
(2) That his sentences violated double-jeopardy principles because, he said, he was originally sentenced to 27 years’ imprisonment for the first-degree-theft and trafficking-in-stolen-identities convictions, and to 5 years’ imprisonment for the possession-of-cocaine conviction and each of the possession-of-a-forged-instrument convictions, with all the sentences ordered to run concurrently, but that four days after the original sentence was imposed, the trial court increased his 5-year sentences to 10 years’ imprisonment and ordered those sentences to run consecutively to the two 27-year sentences, thus resulting in his being punished twice for each of his convictions;
(3) That he was denied his right to counsel of choice when, he said, the trial court refused his repeated requests to fire retained trial counsel and hire new counsel;
(4) That his convictions for first-degree theft and four counts of possession of a forged instrument violated double-jeopardy principles because, he said, the currency that formed the basis of the theft charge was obtained as a result of the possession-of-a-forged-instrument charges and all five charges arose from the same act or omission;
(5) That the evidence was insufficient to sustain his conviction for trafficking in stolen identifies because, he said, the State failed to present evidence of five or more identification documents of the same person or identifying information of five or more separate persons as required by § 13A-8-193(b), Ala.Code 1975;
(6) That his convictions for trafficking in stolen identities and four counts of possession of a forged instrument violated double-jeopardy principles because, he said, the persons named as part of the trafficking-in-stolen-identities charge were the same persons that formed the basis of the four possession-of-a-forged-instrument charges;
(7) That his indictment was multipli-cious “because it renames the single offense of possession of forged instruments as theft of property and/or trafficking in stolen identities” (C. 37); and
(8) That he was denied the effective assistance of counsel both at trial and on appeal because, he said, trial and appellate counsel did not raise the above issues at trial or on appeal.
Shaw attached several exhibits to his petition to support his claims.
*750 On October 4, 2012, Shaw filed a motion for the appointment of counsel, which the circuit court denied on October 5, 2012. On November 20, 2012, Shaw filed a motion requesting that the circuit court expedite the proceedings and schedule an evi-dentiary hearing, which the circuit court denied on November 27, 2012. On or about December 17, 2012, the State filed an answer to Shaw’s petition, arguing that each of Shaw’s claims was meritless. On December 18, 2012, the circuit court issued an order summarily dismissing Shaw’s petition. In its order, the circuit court found that claim (1) and that part of claim (8) regarding ineffective assistance of trial counsel, as set out above, had been “addressed extensively on his direct appeal” and it “decline[d] to replow these grounds.” (C. 108.) The circuit court then stated that “[t]he only colorable issue raised” in the petition was claim (2), as set out above, and the court found that claim to be meritless. (C. 108.) The court did not specifically address in its order claims (3) through (7), as set out above. On January 4, 2013, Shaw filed an “objection” to the circuit court’s order summarily dismissing his petition, arguing that the circuit court erred in not making specific findings of fact regarding each of his claims and in summarily dismissing his petition without receiving a response from the State. The circuit court denied the “objection” on January 10, 2013. This appeal followed.
For a better understanding of Shaw’s claims, we set out the following statement of facts from our unpublished memorandum affirming Shaw’s convictions and sentences:
“In May of 2007, the Royal Bank of Canada (‘RBC’) notified employees at all of its Montgomery area branches that it was conducting an investigation. RBC was looking for a person who was committing bank fraud in the Montgomery area. The suspect was believed to have been at a local branch of RBC on May 9, 2007. RBC sent out a description of a suspect, including an image of the suspect taken from video surveillance at a local branch. On that same day, Bryan Shaffer, a manager at the RBC on the Atlanta Highway, saw Shaw enter and leave the bank and believed him to be the person involved in the bank fraud. Shaffer followed Shaw outside the bank. He saw Shaw get into a vehicle. When Shaffer attempted to write down the number of the vehicle’s license plate, Shaw, apparently noticing Shaffer, switched the license plate on the vehicle and drove away. Shaffer got in his vehicle, followed Shaw, and called police. Shaffer followed Shaw to a Publix grocery store parking lot. Shaffer remained in his vehicle while Shaw got out of his vehicle and walked towards the store. At that time, police arrived at the store, approached Shaw, and took him into custody. At the police station, police compared images of the suspect at the local banks and compared the person in the images to Shaw. Believing Shaw to be the person in the images, police arrested him. Shaw’s vehicle was impounded, and an inventory search revealed an eyeglass case containing crack cocaine, bank statements with account information of other individuals, checkbooks containing checks of several individuals, and a check made out to a Kenneth Dent for $986. Police also found a bag that contained deposit slips that were used to make split deposits — deposits from which a person receives cash back. Police also found other items, including multiple counterfeit identifications. The names and driver’s license numbers on some of these counterfeit identifications matched the names and driver’s license numbers on the canceled *751 forged checks from RBC. In other words, these identifications were used to cash the forged checks. Shaw’s picture was on the identifications. Video surveillance captured Shaw cashing those checks.”
I.
Initially, we point out that Shaw does not pursue in his brief on appeal claims (5), (6), (7), and (8), as set out above. It is well settled that this Court “will not review issues not listed and argued in brief.” Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995). “ ‘[A]l-legations ... not expressly argued on ... appeal ... are deemed by us to be abandoned.’ ” Burks v. State, 600 So.2d 374, 380 (Ala.Crim.App.1991) (quoting United States v. Burroughs, 650 F.2d 595, 598 (5th Cir.1981)). Because Shaw does not expressly argue on appeal claims (5), (6), (7), and (8), as set out above, those claims are deemed abandoned and will not be considered by this Court.
II.
Shaw first contends on appeal that the circuit court erred in summarily dismissing his petition without making specific findings of fact regarding the merits of each of his claims. Shaw raised this issue in his postjudgment motion; therefore, it was properly preserved for our review. However, Shaw’s argument is meritless because the circuit court summarily dismissed his petition pursuant to Rule 32.7(d), Ala. R.Crim. P., and it is well settled that “Rule 32.7 does not require the trial court to make specific findings of fact upon a summary dismissal.” Fincher v. State, 724 So.2d 87, 89 (Ala.Crim.App.1998). As this Court explained in Daniel v. State, 86 So.3d 405 (Ala.Crim.App.2011):
“No evidentiary hearing was held in this case — the circuit court summarily dismissed Daniel’s petition. ‘Because the trial court did not hold an evidentia-ry hearing, it was not required to make specific findings of facts as to each claim.’ Beckworth v. State, [Ms. CR-07-0051, May 1, 2009] — So.3d-, - (Ala.Crim.App.2009). ‘[R]ule 32.9(d), Ala. R.Crim. P., requires findings of fact only if an evidentiary hearing is held. Findings are not required if the petition is dismissed.’ Fowler v. State, 890 So.2d 1101, 1103 (AIa.Crim. App.2004). ‘Rule 32.9(d), Ala. R.Crim. P., requires the circuit court to make specific findings of fact only after an evidentiary hearing or the receipt of affidavits in lieu of a hearing.’ Chambers v. State, 884 So.2d 15, 19 (Ala.Crim.App.2003). See also Ex parte McCall, 30 So.3d 400 (Ala.2008). The circuit court did not err in failing to make written findings of fact concerning Daniel’s claims.”
86 So.3d at 413. Therefore, the circuit court did not err in not making specific findings of fact regarding each of Shaw’s claims.
III.
Shaw also reasserts on appeal claims (1) through (4), as set out above.
Before addressing those claims, we first point out the following:
“ ‘[W]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court’s review in a Rule 32 proceeding is de novo.’ Ex parte White, 792 So.2d 1097, 1098 (Ala.2001). However, where there are disputed facts in a postconviction proceeding and the circuit court resolves those disputed facts, ‘[t]he standard of review on appeal ... is whether the trial judge abused his discretion when he denied the petition.’ Elliott v. State, 601 So.2d 1118, 1119 (Ala.Crim.App.1992).”
*752 Boyd v. State, 913 So.2d 1113, 1122 (Ala.Crim.App.2003).
Rule 32.3, Ala. R.Crim. P., states that “[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.” Rule 32.6(b), Ala. R.Crim. P., states that “[t]he petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.” As this Court noted in Boyd:
“ ‘Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.’ Boyd v. State, 746 So.2d 364, 406 (Ala.Crim.App.1999). In other words, it is not the pleading of a conclusion ‘which, if true, entitle[s] the petitioner to relief.’ Lancaster v. State, 638 So.2d 1370, 1373 (Ala.Crim.App.1993). It is the allegation of facts in pleading which, if true, entitle a petitioner to relief. After facts are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R.Crim. P., to present evidence proving those alleged facts.”
913 So.2d at 1125.
“The burden of pleading under Rule 32.3 and Rule 32.6(b) is a heavy one. Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The full factual basis for the claim must be included in the petition itself. If, assuming every factual allegation in a Rule 32 petition to be true, a court cannot determine whether the petitioner is entitled to relief, the petitioner has not satisfied the burden of pleading under Rule 32.3 and Rule 32.6(b). See Bracknell v. State, 883 So.2d 724 (Ala.Crim.App.2003).”
Hyde v. State, 950 So.2d 344, 356 (Ala.Crim.App.2006).
With these principles in mind, we address each of Shaw’s claims in turn.
A.
First, Shaw reasserts on appeal claim (3), as set out above — that he was denied his Sixth Amendment right to counsel of choice when, he says, the trial court refused his repeated requests to fire his retained counsel and to retain new counsel. The record from Shaw’s direct appeal refutes this claim.[1]
In his petition, Shaw alleged that his trial counsel, Amardo Wesley Pitters, had been retained to represent him, but that there “were constant problems” between him and Pitters “[b]efore and throughout trial” and that he “begged the trial court to allow him to obtain another lawyer because of the breakdown in communication between him and Attorney Pitters.” (C. 23.) Shaw maintained that “[t]here were obvious major problems between [him] and his attorney, Wesley Pitters, first evidenced in the record on June 9, 2008, at a suppression hearing, almost a year prior to the trial” and that “[t]hings between them only got worse” in the year leading up to the trial. (C. 23.) According to Shaw, Pitters had an outburst in open court and complained that Shaw was “ ‘frustrating’ ” him. (C. 24.) Shaw said that he and Pitters were “more than frustrated with each other months before and through the trial and sentencing in this instant case.” *753 (C. 24.) Shaw alleged that “[b]efore and throughout the beginning of the trial, [he] and Attorney Pitters displayed] their inability to cooperate, communicate, and work together” and that, as a result, he “continuously requested] that he be given an opportunity to get another lawyer, all to no avail.” (C. 24.) Shaw further alleged that “his continuous request to be allowed to obtain another attorney to adequately represent him was not designed for the purpose of delaying and disrupting the trial” and that, therefore, the trial court “should have made the kind of inquiry that might have eased [his] dissatisfaction, distrust, and/or concern,” but that, instead, the court “subtly pressur[ed] and [led him] to proceed because he had been in jail so long, despite the obvious and clear conflict between him and Attorney Pitters.” (C. 24.) Shaw maintained that he and Pitters had “an irreconcilable conflict” but that at no time “did the trial court inquire or try to determine whether the conflict between [him] and Attorney Pitters was so great that it resulted in a total lack of communication preventing an adequate defense.” (C. 25.) Shaw also argued that the denial of counsel of choice is “structural — not subject to harmless-error analysis” (C. 23) and that “[t]he continuous denial of this qualified right to counsel of choice is reversible error regardless of whether prejudice is shown.” (C. 26.)
The record from Shaw’s direct appeal reflects that Shaw was initially represented by Jacob A. Dubin.[2] Subsequently, Shaw, or his family, retained Pitters to represent Shaw. On January 9, 2008, Pit-ters entered his notice of appearance on behalf of Shaw. Pitters represented Shaw through the April 2009 trial, but, as explained in more detail below on Part III.B. of this opinion, new counsel was appointed to represent Shaw at sentencing. Despite Shaw’s allegation in his petition that his troubles with Pitters began in June 2008, almost a year before his trial began, the record reflects that Shaw waited until the day his trial began, after the jury was struck, to request that he be allowed to substitute new counsel. The record reflects that, after voir dire but before the striking of the jury, the following occurred:
“MR. PITTERS: Judge, before we go on, I don’t want to waste your time, the Court’s time, these jurors’ time. And I’m having a whale of a time with my client because he’s insistent that you’re not going to have trial today — that you’re not going to have a trial — You’ve not given us a ruling on the Motion to Suppress. Yesterday, I was over at the jail, he was insisting that I file several motions; and I’ve done so.
“THE COURT: We’ll take them up right after lunch. I’m just trying to get the jurors out of here.”
(Record on Direct Appeal “RDA,” R. 83.) The jury was then struck, after which Shaw requested that he be allowed to be speak on his own behalf.
At that point, the trial court permitted Shaw to put anything on the record he wished. Shaw complained generally: “I don’t feel like I can get a fair and impartial trial.” (RDA, R. 86.) When asked why, Shaw said his belief was based on “ineffective assistance of counsel ... [and] prose-cutional [sic] misconduct.” (RDA, R. 86.) Shaw also requested that the trial judge recuse himself a motion the trial court denied. Shaw further requested a continuance until he could obtain a transcript *754 from a federal trial,[3] and the continuance was denied. When requesting the continuance, Shaw pointed out that attorney Winston Durant had already obtained one continuance on his behalf even though Durant had not been retained to represent Shaw. When asked if he had anything else to say, Shaw again stated only generally that “I just can’t get no fair trial. That’s all I’ve got to say. I ain’t going to be able to get a fair trial.” (RDA, R. 89.) After further complaining about the lack of the transcript from the federal trial, Shaw then pointed out that the trial court had not yet ruled on the motion to suppress. The trial court then denied the motion to suppress.
After the denial of the motion to suppress, Pitters put on the record that Durant, although not hired by Shaw, shared office space with him and was helping him with the trial, apparently free of charge. Pitters then indicated that if Shaw did not want Durant to help with the trial, Pitters would request that Durant leave the courtroom. When asked by the trial court about his “problem” with Durant, the following occurred:
“[Shaw]: Your Honor, I really feel like I should talk to my family about getting me a lawyer. I’m talking about for real. That’s the way I feel because I don’t feel like I’m going to get a fair trial. I’m talking about and then my attorney — to tell the truth — is a lot that’s going on that I really don’t — since coming over there and seeing me, talking about a trial — I really wasn’t prepared for no trial today. And I haven’t called my folks yet. But then there’s a certain situation dealing with my accounts—
“THE COURT: —Mr. Shaw, let me say this to you. Mr. Durant is here at the request, I assume, of Mr. Pitters.
Mr. Durant has tried more cases in this courtroom than any lawyer. And I think he’s one of the best lawyers I’ve seen. If you want his assistance, he’s here to help you. If you don’t want him here, he’ll go away. But don’t sit here and tell me about — You’re complaining about ineffective assistance of counsel where you’re sitting there, you’ve got two experienced lawyers sitting there at your side. Make up your mind, man.
“[Shaw]: Your Honor, I’m talking about — I think I need another lawyer.
“THE COURT: Well, you’re not going to get one.
“[Shaw]: You the Judge, Your Honor.
“THE COURT: It’s been two years now.
“Now do you want Mr. Durant to be in here with you or not?
“[Shaw]: Well, I’m talking about, if we’re going to have a kangaroo court, you can have who you want put in here.
“THE COURT: Well, it’s not up to me.
“[Shaw]: I’m talking about, I’m being forced to take lawyers—
“THE COURT: I didn’t hire Mr. Pit-ters.
“[Shaw]: I know. My family did.
“THE COURT: Okay.
“[Shaw]: My family did, Your Honor. And if I’m going to be forced to take an attorney to go to trial that I don’t feel comfortable going to trial and don’t feel like I can get a fair trial then, you know, you’re the judge. I can’t buck against you.
“THE COURT: The only question I have for you right now, Mr. Shaw, with regard to Mr. Durant, do you want him here to assist you? Or do you not want *755 him here to assist you? Or you don’t care, one way of the other?
“[Shaw]: Your Honor, you know what, I feel like I should get me another lawyer.
“THE COURT: Well, that’s not going to happen, Mr. Shaw. So here are your choices—
“[Shaw]: —you can just let both of them stay here because I can’t get no fair trial, Your Honor.”
(RDA, R. 91-93.)
The selected jury was then brought into the courtroom, sworn, and recessed for lunch. At that point, the following occurred:
“[Shaw]: Your Honor, can I show you a letter before you go [to lunch]?
“THE COURT: All right.
“[Shaw]: This was the situation that I tried to address a long time ago. This is a letter from Mr. Pitters to my folks (indicating). And I ain’t getting no fair—
“THE COURT: —I tell you what, Mr. Shaw, if you’ll show it to me at about 1:20, I’ll look at it.
“[Shaw]: All right. I’ll have it for you then, Your Honor, where Mr. Pitters’s services were terminated way back in May.”
(RDA, R. 94-95.) The record indicates that Shaw never reasserted any objection or request relating to the letter. The letter to which Shaw was apparently referring is included in the record from Shaw’s direct appeal. In the letter, from Pitters to Shaw’s sister, Pitters stated that at a hearing on May 27, 2008, several defense motions had been denied “to the displeasure of your brother.” (RDA, C. 114.) Pitters then stated that “Mr. Shaw demonstrated his displeasure by a loud outburst [and] verbal attack on me and the court, including disparaging comments of racial slurs” and that Shaw had “stated that he was terminating my services.” (RDA, C. 114.) Pitters also stated in the letter, however, that he was scheduled to see Shaw again on May 29, 2008.
Following the lunch recess, Pitters reasserted, based on Shaw’s conduct, that Shaw was incompetent to stand trial. The court determined that Shaw was, in fact, competent based on the court’s dealings ■with Shaw. The following then occurred:
“MR. PITTERS: Judge, are you inclined to entertain a plea?
“THE COURT: I will.
“[Prosecutor]: There’s no offer from the State at this point.
“THE COURT: Well, let’s reconsider.
“(Pause in the proceedings.)
“THE COURT: Are we ready to go, guys?
“MR. PITTERS: Okay. Judge, we’ll go forward.
“[Shaw]: I want to get me another lawyer. I want another lawyer. I done asked for another lawyer two or three times. And you’re forcing me to keep him. I don’t want him no more. I asked you a thousand times.
“THE COURT: Mr. Shaw, all he’s doing is presenting you an offer. It’s up to you whether to take it or not take it.”
(RDA, R. 98-99.) At this point in the proceedings, Shaw began complaining that the police officers involved in the case had lied and had blinded him in one eye. The following then occurred:
“[Shaw]: Get me out of the state of Alabama. That’s what they need to be doing. And they need to be doing it today.
“THE COURT: Mr. Shaw, you’re not getting out of the state of Alabama today.
“[Shaw]: Sir?
*756 “THE COURT: You’re not getting out of the state of Alabama today. Do you want to go to trial or not?
“[Shaw]: I don’t care what you do, Your Honor. Do it like you want to do it.”
(R. 101.) The jury was then brought into the courtroom, and the trial court gave its preliminary instructions. At that point, Shaw requested to be taken back to his jail cell “[a]nd they can just have this trial without me.” (R. 104.) The trial court denied Shaw’s request.
After opening statements, the State presented its case-in-chief. Pitters ably represented Shaw, making objections and cross-examining witnesses and, at one point, requesting to recall one of the State’s witnesses for further cross-examination at Shaw’s suggestion.[4] Just before the charge conference, Shaw again requested that he be allowed time to obtain the transcript from the federal trial to establish that the police officers involved in the case had lied and had blinded him. The trial court denied the request.
After the State rested and the trial court discussed with Shaw his right to testify or not to testify, Shaw again asserted that he had received ineffective assistance of counsel, at which point the trial court allowed Shaw to confer with Pitters. After a brief pause, the following occurred:
“[Shaw]: Your Honor, I feel like it’s a total breakdown between me and my attorney as I stipulated yesterday at the beginning of this trial that I felt like I needed another attorney. I needed a continuance, Your Honor. But the case done went this far. And there’s still a breakdown between me and my attorney. I’m talking about, I ain’t feeling like I’m being properly represented by Mr. Pitters for the money my folks gave — I don’t feel like I’ve been properly represented by him at all. You understand?
“And as far as it’s going now, you’re the Judge. I asked you yesterday at the beginning of trial, Your Honor, if I could get another lawyer and get a continuance. You denied me getting me another lawyer. I can’t represent myself. I’m talking about, if I could have represented myself, I could really tell the truth, everything — I requested of the Court, I asked you yesterday, Your Honor, could I get me another lawyer and get a continuance because they done put me in a position where the requested — Attorney Winston Durant come on record and asked for a continuance that I might have the transcripts from the Federal trial. Okay. They come back and put that off until the 6th. We rushing the trial until — We come back on the 6th. I requested that I be able to get me an attorney and then a continuance because the Federal Court done already granted me an opportunity to get these transcripts which the Court allowed them to put off on February 4th. And now we’re in the fix — a trial — and the breakdown ain’t just started now. It started at the beginning of this trial, Your Honor. I’m talking about when I asked Your Honor — like I was telling you — that on this case about you — And I don’t want to be fighting against you and your daddy [the judge who presided over the federal trial] and all them. But they’re putting me in a position, I ain’t got no more choice. The folks done blinded me. I’m not fixing to lay down — I requested an attorney that my folks might be able to afford one that I can fight it. And they done gave him $8,000. And he ain’t doing such a great job. Do you understand me?
*757 “Now I asked you yesterday that I might have a continuance that I could get me an attorney because I think my folks can get me one because they got him. And then they done put me in a position where they recruited — it wasn’t even—
“THE COURT: —Mr. Shaw, let me ask you something. You’re over there in the county jail; right?
“[Shaw]: Yes, sir.
“THE COURT: Been sitting over there for two years.
“[Shaw]: Yes, sir, just about.
“THE COURT: Aren’t you ready to get that over with?
“[Shaw]: I’m ready to get it over with. My life is on the line.”
(RDA, R. 230-32.) After further discussion regarding his right to testify, Shaw then stated “I had advised him to draw up his motion to withdraw, he didn’t — I need another attorney. That’s what I need.” (RDA, R. 234.) The court did not specifically rule on the request, but acknowledged that Shaw was unhappy with his attorney.
The Sixth Amendment to the United States Constitution guarantees that “[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.” “Comprehended within the Sixth Amendment right to assistance of counsel is the right to the effective assistance of counsel and the right to counsel of one’s own choosing.” Lane v. State, 80 So.3d 280, 294 (Ala.Crim.App.2010). However, the right to counsel of choice is not absolute. See Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) (“The Sixth Amendment right to choose one’s own counsel is circumscribed in several important respects.”); and Lane, 80 So.3d at 295 (“The right to counsel of choice — either initially or continued representation — is not absolute — either for indigent or nonin-digent defendants.”). “Rather, this Court has held that a defendant’s right to counsel of his choice must be balanced against the need for the efficient and effective administration of justice.” Hamm v. State, 913 So.2d 460, 472 (Ala.Crim.App.2002).
Initially, we note that neither at trial nor in his petition does Shaw argue that he was indigent and that he wanted the trial court to appoint counsel to replace retained counsel. Rather, at trial, Shaw indicated that he wanted to have his family hire another lawyer and in his petition he alleged that he wanted to “obtain” another lawyer. Thus, it appears that Shaw merely wanted to fire his retained counsel, Pit-ters, and hire new counsel to represent him.
That being said, Shaw alleged in his petition that his problems with Pitters began almost a year before the April 2009 trial, at the June 2008 suppression hearing. Clearly then, Shaw had ample time before the trial began to fire Pitters and to retain new counsel to represent him, and he did not need the trial court’s approval to do so. “Unlike an indigent defendant, a person with the means to retain a lawyer need not obtain court approval to do so.” State v. Keerins, 145 Or.App. 491, 494, 932 P.2d 65, 67 (1996). See also State v. Martinez, 224 Or.App. 588, 591, 198 P.3d 957, 959 (2008) (“Defendant did not need the trial court’s permission to discharge his court-appointed attorney before retaining private counsel.”). As the Illinois Supreme Court explained in People v. Pecoraro, 144 I11.2d 1, 161 Ill.Dec. 296, 578 N.E.2d 942 (1991):
“It was not within the trial court’s rubric of authority to advise or exercise any influence or control over the selection of counsel by defendant, who was able to, and did, choose counsel on his own accord. (People v. Walsh (1963), 28 I11.2d *758 405, 409, 192 N.E.2d 843.) Moreover, the trial judge could not force defendant to retain counsel other than that chosen by defendant. (People v. Johnson (1979), 75 I11.2d 180, 185, 25 Ill.Dec. 812, 387 N.E.2d 688.) Defendant and his counsel were the only parties who could have altered their attorney-client relationship.”
144 IH.2d at 15, 161 IlLDec. 296, 578 N.E.2d at 948. At any time before his trial began, Shaw could have fired Pitters and retained new counsel. Indeed, the May 2008 letter Pitters wrote to Shaw’s sister reflects that Shaw threatened to fire Pitters and to hire a new attorney. Yet, for whatever reason, Shaw did not follow through on his threat. The record contains no indication that Shaw took any steps at all in the months preceding his trial to obtain new counsel. Shaw cannot now complain that he was denied his right to counsel of choice when Shaw could have, at any time before his trial, fired Pitters and hired new counsel but failed to do so.
Moreover, Shaw’s request, after his trial began, that he be permitted to retain new counsel was clearly untimely. A motion to substitute counsel made the first day of trial is “untimely under all but the most exigent circumstances.” United States v. Corporan-Cuevas, 35 F.3d 953, 956 (4th Cir.1994). See also United States v. Trujillo, 376 F.3d 593, 606 (6th Cir.2004) (motion for substitution of counsel three days before trial is set to begin is untimely). “It is within the trial court’s sound discretion to refuse to allow a defendant to dismiss his attorney after the trial has commenced.” Hayes v. State, 340 So.2d 1142, 1143 (Ala.Crim.App.1976). As already noted, “[a] defendant’s right to counsel of his choice must be balanced against the need for the efficient and effective administration of justice.” Hamm, 913 So.2d at 472. In Lovin v. State, 286 S.W.3d 275 (Tenn.2009), the Tennessee Supreme Court explained:
“When a prisoner desires to discharge a retained lawyer, the appropriate focus is on balancing the prisoner’s right to discharge his or her lawyer against the court’s obligation to administer justice efficiently by avoiding unreasonable delay. People v. Ortiz, 275 Cal.Rptr. 191, 800 P.2d [547] at 552-53 [ (1990) ]; Jackson v. State, 979 So.2d 442, 444 (Fla.Dist.Ct.App.2008). A prisoner’s exercise of his or her right to discharge his or her lawyer cannot be permitted to ‘unduly hinder the fair, efficient and orderly administration of justice.’ United States v. Panzardi Alvarez, 816 F.2d 813, 816 (1st Cir.1987) (citations omitted). Thus, the courts should not permit prisoners to use their ability to discharge their retained lawyer as a tactical ploy to disrupt and delay orderly judicial proceedings. State v. Chadwick, 224 Term. 75, 78-80, 450 S.W.2d 568, 570 (1970); State v. Zyla, 628 S.W.2d 39, 41-42 (Tenn.Crim. App.1981); see also Tyler v. State, 945 So.2d 662, 664 (Fla.Dist.Ct.App.2007).”
286 S.W.3d at 286. Although Shaw alleged in his petition that his request to retain new counsel was not for the purpose of delaying his trial, those portions of the record quoted above indicate otherwise. Indeed, it is clear from the record that Shaw contrived a dispute between him and Pitters in an attempt to delay his trial. Therefore, Shaw was not denied his right to counsel of choice.
B.
Shaw also reasserts on appeal claim (2), as set out above — that his sentences violate principles of double jeopardy. He argues on appeal, as he did in his petition, that he was originally sentenced to 27 years’ imprisonment for the first-degree-theft and trafficking-in-stolen-iden *759 tities convictions, and to 5 years’ imprisonment for the possession-of-cocaine conviction and for each of the possession-of-a-forged-instrument convictions, with all the sentences to run concurrently, but that four days after the original sentences were imposed, the trial court increased his 5-year sentences to 10-year sentences and ordered that those sentences were to run consecutively to the two 27-year sentences, thus resulting in his being punished twice for each of his convictions. Relying on Shivener v. State, 958 So.2d 913 (Ala.Crim.App.2006), and other similar cases holding that a trial court is not authorized to increase a defendant’s sentence after it has entered a valid sentence, Shaw argues that once the trial court sentenced him on May 14, 2009, it had no authority, four days later on May 18, 2009, to increase the validly imposed sentences. This argument is meritless.
The record from Shaw’s direct appeal reflects that the jury returned its verdicts finding Shaw guilty on all counts on April 7, 2009. On April 14, 2009, Shaw filed a pro se notice of appeal stating that he wanted to appeal his convictions because, he said, his trial counsel had been ineffective.[5] On April 21, 2009, Pitters moved to withdraw from representing Shaw.[6] In an order dated by the trial court April 17, 2009, but stamped as filed in the circuit clerk’s office on April 21, 2009, the trial court granted Pitters’s motion to withdraw and appointed new counsel “to represent [Shaw] in the appeal of this matter.” (RDA, C. 118.)[7] On May 14, 2009, Shaw appeared for a sentencing hearing. Pit-ters also appeared at the sentencing hearing purportedly representing Shaw and making arguments on Shaw’s behalf. The trial court sentenced Shaw to 5 years’ imprisonment for the possession-of-cocaine conviction and each of the possession-of-a-forged-instrument convictions and to 27 years’ imprisonment for the first-degree-theft and trafficking-in-stolen-identities convictions, and ordered that all the sentences run concurrently with each other.
Immediately following the imposition of sentence, the following occurred:
“MR. PITTERS: I would ask the Court to — there is an issue here with respect to — I’ve previously filed a Motion to Withdraw. Mr. Shaw has — for all practical purposes has — been asking for me to withdraw from this case. When the verdict was announced, he gave oral notice of appeal — The Alabama Court of Criminal Appeals — We’ll have to wait until sentencing. So at this time, I’ll sort of re-file orally and ask the Court for leave to withdraw. I was retained—
“THE COURT: —file a written motion, please. Have you already filed a written motion?
“MR. PITTERS: Yes, I did.
“THE COURT: Okay. Well, it will be granted. And we will appoint Mr. Shaw another attorney unless he wants to hire his own.
“[Shaw]: Your Honor, I would like to say something.
“THE COURT: All right.
“[Shaw]: You sent an order over to me that I got a copy of it that stated that on the 17th that Mr. Pitters had *760 withdrew then. I’m questioning, how he come back to be representing me now? I mean, you ordered that he withdrew on the 17th. And I’m wondering, how he come to be representing me now? I’m talking about at sentencing. You know, I’m talking about—
“THE JUDICIAL ASSISTANT: I may be able to clarify that a little bit for Mr. Shaw. Mr. Pitters was allowed to withdraw as to your appeal. You filed an appeal.
“[Shaw]: If Mr. Pitters withdrew, he withdrew, period, because my folks paid him $8,500,1 mean, to represent me. If he withdrew on the 17th, he filed a motion. The Court granted his motion. He shouldn’t have been here representing me now. That’s the way I look — I think that’s the way the law should go. If he withdrew on the 17th from my case and then he come back this morning to represent me, how is that? How are you going to represent? How are you going to withdrew on the 18th and then come back and represent me when you feel like representing me—
“THE COURT: —do you want me to appoint you another attorney for your sentencing?
“[Shaw]: I would like that.
“THE COURT: Okay. We’ll do the sentencing next Monday.
“Ms. Battle-Hodge, you’re appointed to represent Mr. Shaw on Monday.
“MS. BATTLE-HODGE: Thank you, Your Honor.
“MR. PITTERS: May I be excused?
“THE COURT: All right.”
(RDA, R. 288-90.) The proceedings were adjourned until May 18, 2009, at which point a second sentencing hearing was held, during which Juraldine Battle-Hodge represented Shaw and made arguments on Shaw’s behalf. At the second sentencing hearing, the trial court sentenced Shaw to 10 years’ imprisonment for the possession-of-coeaine conviction and for each of the possession-of-a-forged-instrument convictions and to 27 years’ imprisonment for the first-degree-theft and trafficking-in-stolen-identities convictions, and ordered that the five 10-year sentences run concurrently with each other but run consecutively to the two 27-year convictions.
Shaw is correct that “[o]nce a valid sentence has been entered, it cannot, in the absence of fraud or another compelling reason, be altered anytime thereafter so as to increase the severity of the sentence.” Ex parte Tice, 475 So.2d 590, 591-92 (Ala.1984) (emphasis added). “Increasing a valid sentence after a defendant has commenced serving the sentence violates the prohibition against double jeopardy in both the United States and Alabama Constitutions.” Snell v. State, 723 So.2d 105, 108 (Ala.Crim.App.1998) (emphasis added). However, as this Court explained in Bryant v. State, 29 So.3d 928 (AIa.Crim.App.2009):
“‘[A]n increase in sentence where the [previous] sentence is void is the “most common exception to the general rule prohibiting enhancement of an imposed sentence.” ’ Cline v. State, 571 So.2d 368, 369-70 (Ala.Crim.App.1990), quoting A. Campbell, Law of Sentencing § 59 (1978). ‘[I]n correcting an illegal sentence, the double jeopardy protection is not violated even if the defendant has begun serving the original sentence.’ Id. at 370 (emphasis added [in Bryant ]). ‘ “[E]ven after the defendant has begun to serve his sentence, the trial court is obligated to alter an invalid sentence; further, any increase in the sentence does not raise double jeopardy problems.” ’ Greenhill v. State, 746 So.2d 1064, 1072 (AIa.Crim.App.1999) (emphasis added [in *761 Bryant ]), quoting Love v. State, 681 So.2d 1108, 1109 (Ala.Crim.App.1996). See also Bozza v. United States, 380 U.S. 160, 67 S.Ct. 645, 91 L.Ed. 818 (1947), and Hughes v. State, 518 So.2d 890 (Ala.Crim.App.1987).”
29 So.3d at 937.
In this case, the original sentences imposed on Shaw on May 14, 2009, were not valid sentences because Shaw was not represented by counsel during that original sentencing hearing. As Shaw himself argued to the trial court at the May 14, 2009, sentencing hearing, counsel who was present at that hearing had already withdrawn from representing him and, thus, Shaw was, in effect, without counsel during that hearing. It is well settled that “[a] defendant has a right to counsel during sentencing.” Tarver v. State, 985 So.2d 494, 494 (Ala.Crim.App.2006). “Unless a defendant has or waives assistance of counsel, the Sixth Amendment is a jurisdictional bar to a valid conviction and sentence.” Berry v. State, 630 So.2d 127, 130 (Ala.Crim.App.1993). “[I]t is the lack of counsel, coupled with the absence of a knowing and intelligent waiver thereof, that acts to deny the defendant counsel and to jurisdictionally bar his” sentence. Coughlin v. State, 842 So.2d 30, 33 (Ala.Crim.App.2002). If a criminal defendant is denied counsel at sentencing, the resulting sentence is illegal. See Ex parte Anderson, 434 So.2d 737, 737-38 (Ala.1983) (where defendant was denied counsel at sentencing, the sentence was erroneous and a new sentencing hearing was necessary). Because Shaw was effectively denied counsel at the original May 14, 2009, sentencing hearing, the sentences imposed at that hearing were illegal and void for lack of jurisdiction. Therefore, resentenc-ing Shaw four days later was not only permissible but was required to correct the illegality in the original sentencing and did not violate double-jeopardy principles.
C.
Shaw further reasserts on appeal claim (4), as set out above — that his convictions for first-degree theft and four counts of possession of a forged instrument violated double-jeopardy principles.. He argues on appeal, as he did in his Rule 32 petition, that the currency that formed the basis of the theft charge was obtained as a result of the possession-of-a-forged-instrument charges and that, thus, all five charges arose from the same act or omission, and convictions for all five violated his right to be free from double jeopardy. This argument is meritless on its face.
It is well settled that “[a] single crime cannot be divided into two or more offenses and thereby subject the perpetrator to multiple convictions for the same offense.” Ex parte Darby, 516 So.2d 786, 787 (Ala.1987). However:
“Under the principles of double jeopardy, ‘[t]he applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.’ Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Therefore, ‘ “[a] single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.” ’ Id. (quoting Gavieres v. United States, 220 U.S. 338, 342, 31 S.Ct. 421, 55 L.Ed. 489 (1911), in turn quoting Morey v. Commonwealth, 108 Mass. 433 (1871)).”
*762 Ex parte Dixon, 804 So.2d 1075, 1078-79 (Ala.2000). “In other words, as long as each statutory offense requires proof of additional facts, the double jeopardy prohibition is not implicated.” Ex parte Dawson, 675 So.2d 905, 907 (Ala.1996).
Shaw was indicted for, and convicted of, first-degree theft of property by deception for the theft of currency exceeding $2,500. (RDA, C. 9.) Section 13A-8-2(2), Ala.Code 1975, states that “[a] person commits the crime of the theft of property if he or she ... [kjnowingly obtains by deception control over the property of another, with intent to deprive the owner of his or her property.” Section 13A-8-S(a), AIa.Code 1975, defines first-degree theft, in relevant part, as “[tjhe theft of property which exceeds two thousand five hundred dollars ($2,500) in value.” On the other hand, § 13A-9-6(a), Ala.Code 1975, provides that “[a] person commits the crime of criminal possession of a forged instrument in the second degree if he possesses or utters any forged instrument of a kind specified in Section 13A-9-3 with knowledge that it is forged and with intent to defraud.”[8]
Contrary to Shaw’s contention, first-degree theft of property and second-degree possession of a forged instrument each require elements that the other does not. For example, first-degree theft requires that the value of the property exceed $2,500, while second-degree possession of a forged instrument has no minimum-value requirement. Second-degree possession of a forged instrument requires possessing or uttering a “forged instrument” — defined as “[a] written instrument which has been falsely made, completed or altered,” § 13A-9-K7), Ala.Code 1975 — listed in § 13A-9-3(a), while first-degree theft does not require that the property stolen be a falsely made, completed, or altered instrument listed in § 13A-9-3(a). Because first-degree theft by deception and second-degree possession of a forged instrument each require elements that the other does not, convictions for both first-degree theft and second-degree possession of a forged instrument arising out of the same conduct or transaction do not violate double-jeopardy principles.
D.
Finally, Shaw reasserts on appeal claim (1), as set out above — that the trial court lacked jurisdiction to render the judgments or to impose the sentences because, he said, he was incompetent to stand trial. This claim, however, was not pleaded with sufficient specificity to satisfy the requirements in Rules 32.3 and 32.6(b), Ala. R.Crim. P.
In his petition, Shaw alleged that “he was mentally impaired and suffered from severe schizophrenia.” (C. 14.) Shaw said that he had “a history of long-term severe mental illness, suffering from periodic and frequent bouts of severe schizophrenia where he was and is completely unable to function normally, competently, or reasonably, in normal day-to-day basic decision making.” (C. 15.) He also stated that his “intellectual disability” originated “in his childhood or early adulthood” and resulted in “limitations in his daily life skills needed to live independently in the community and an inability to make coherent and reasonable decisions.” (C. 14.) Shaw further alleged that his “behavior throughout trial was irrational and inappropriate” and evidenced that he was not “able to assist in his own defense in *763 any meaningful way.” (C. 14.) Shaw stated that “a simple reading of pages 95-101 of the trial transcript ” as well as Exhibits A, B, and C, attached to his petition,[9] established that he was incompetent at the time of trial. (C. 17.)
Exhibit A attached to Shaw’s petition is a “Rating Decision” by the Department of Veterans Affairs (“DVA”) dated October 16, 2003, wherein the DVA states that Shaw served in the United States Army from August 22, 1968, through June 28, 1969, and was “a veteran of the Vietnam Era.” (C. 45.) The DVA then stated that “[s]ervice connection for schizophrenia is granted with an evaluation of 70 percent.” (C. 45.) Exhibit B is a letter from Serena Lurie Bloomfield, a licensed psychologist, dated July 5, 2010, in which Bloomfield states, in relevant part:
“My records indicate that you served in the United States military and that you have co-morbid diagnoses of substance abuse and Posttraumatic Stress Disorder. You also had a history of Schizophrenia with schizoid features and the Posttraumatic Stress Disorder.
“It should be known that the first time I evaluated you was in 1997. I saw you numerous times since then....
“I conducted numerous evaluations and reviewed a great deal of documentation involving you and your mental health condition. My impressions were in the past at least that you had a substance dependence disorder, that you had numerous mental health conditions beginning at age 19. You were discharged from the United States military after serving in combat related activities in Vietnam. As a child you were diagnosed with hyperactivity. You experience chronic nightmares, flashbacks, cold sweats, auditory and visual hallucinations.
“My diagnostic impressions included Posttraumatic Stress Disorder; Psychotic Disorder NOS; Schizophrenia, Chronic Undifferentiated Type; Substance Abuse Dependence. Even with these diagnoses I most often found you very cooperative and attempting to seek treatment.”
(C. 46.) Finally, Exhibit C appears to be admittance records to a psychiatric hospital in Florida — one dated September 21, 1993, and the other dated March 15, 1995. The 1993 record lists the diagnoses on admission as:
“AXIS I: Polysubstance Abuse 305.90; Organic Mood Disorder 292.9; R/O Malingering V65.2
“AXIS II: R/O Antisocial Personality Disorder 301.7.
“AXIS III: Awaits complete physical exam and lab results.”
(C. 50.) The record states that the diagnoses on discharge were the “[s]ame as above” but notes: “Client released before final diagnosis was given.” (C. 50.) The 1995 record lists the diagnoses on admission as
“AXIS I: Psychotic Disorder NOS 298.9; Polysubstance Abuse 305.90; R/O Malingering V65.20
“AXIS II: No Dx
“AXIS III: No Dx.”
(C. 49.) On discharge the 1995 record lists the following diagnoses:
*764 “AXIS I: Psychotic Disorder 298.9; Po-lysubstance Abuse 305.90 “AXIS II: No Dx
“AXIS III: Tuberculosis Class II (+PPD) 011.90; Hyperlipoproteinemia Type II A 272.0; Hiatal Hernia, asymptomatic 553.5; Allergy to Pork 693.1”
(C. 49.)
“A defendant is mentally incompetent to stand trial or to be sentenced for an offense if that defendant lacks sufficient present ability to assist in his or her defense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against the defendant.” Rule 11.1, Ala. R.Crim. P. However:
“[T]he law is clear that ‘[p]roof of the incompetency of an accused to stand trial involves more than simply showing that the accused has mental problems or psychological difficulties.’ Bailey v. State, 421 So.2d 1364, 1366 (Ala.Cr.App. 1982).
“ ‘ “A distinction must be made between mental illness and mental incompetency to stand trial, and the fact that a defendant is mentally ill does not necessarily mean that he is legally incompetent to stand trial. Thus, not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence of defendant’s mental unfitness must indicate a present inability to assist counsel or understand the charges.” ’
“Cowan v. State, 579 So.2d 13, 15 (Ala.Cr.App.1990) (quoting 22A C.J.S. Criminal Law § 550 (1989) (footnotes omitted)).”
Thomas v. State, 766 So.2d 860, 881 (Ala.Crim.App.1998), aff'd, 766 So.2d 975 (Ala.2000), overruled on other grounds by Ex parte Taylor, 10 So.3d 1075 (Ala.2005). “Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial.” Medina v. Singletary, 59 F.3d 1095, 1107 (11th Cir.1995).
Shaw’s allegations in his petition that he had suffered from mental illness for most of his adult life and his exhibits referencing various diagnoses in the early 1990’s, long before his 2009 trial, as well as the letter from the psychologist dated in 2010, but referencing his mental illnesses diagnosed as early as 1997, also long before his 2009 trial, are simply not sufficient to satisfy the pleading requirements in Rule 32.3 and Rule 32.6(b) and to indicate that Shaw was incompetent to stand trial. Therefore, we conclude that Shaw’s claim that he was incompetent to stand trial was not sufficiently pleaded.
IV.
Finally, Shaw contends that the circuit court erred in summarily dismissing his petition without affording him an evi-dentiary hearing.
Rule 32.7(d), Ala. R.Crim. P., authorizes the circuit court to summarily dismiss a petitioner’s Rule 32 petition
“[i]f the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings ...”
See also Hannon v. State, 861 So.2d 426, 427 (Ala.Crim.App.2003); Cogman v. State, 852 So.2d 191, 193 (Ala.Crim.App.2002); Tatum v. State, 607 So.2d 383, 384 (Ala.Crim.App.1992). In addition, “ ‘ “[w]here a simple reading of the petition for post-conviction relief shows that, assuming every allegation of the petition to be true, it is obviously without merit or is precluded, *765 the circuit court [may] summarily dismiss that petition.’”” Bryant v. State, [Ms. CR-08-0405, February 4, 2011] — So.3d -, - (Ala.Crim.App.2011) (quoting Bishop v. State, 608 So.2d 345, 347-48 (Ala.1992) (quoting in turn Bishop v. State, 592 So.2d 664, 667 (Ala.Crim.App.1991) (Bowen, J., dissenting))). Summary disposition is also appropriate where the record directly refutes a Rule 32 petitioner’s claim. See Duncan v. State, 925 So.2d 245 (Ala.Crim.App.2005). Because, as explained above, all the claims from his petition that Shaw pursues in his brief on appeal were either meritless on their face, or directly refuted by the record from his direct appeal, or insufficiently pleaded, summary disposition of Shaw’s Rule 32 petition was appropriate.
Based on the foregoing, the judgment of the circuit court is affirmed.
AFFIRMED.
WELCH and BURKE, JJ., concur.
WINDOM, P.J., concurs in the result.
JOINER, J., concurs in part; concurs in the result in part; and dissents in part, with opinion.

. This court may take judicial notice of its own records, and we do so in this case. See Nettles v. State, 731 So.2d 626, 629 (Ala.Crim.App.1998), and Hull v. State, 607 So.2d 369, 371 n. 1 (Ala.Crim.App.1992).

. Dubin filed a notice of appearance on August 7, 2007, some three months before Shaw was indicted.

. It appears that Shaw sued the Montgomery Police Department in federal court as a result of his arrest on the charges giving rise to his convictions.

. Because the witness had already left, the court refused the request.

. The notice was stamped as filed in the circuit clerk's office on April 14, 2009, but was dated by Shaw April 12, 2009.

. The motion is both dated by Pitters April 21, 2009, and stamped as filed in the circuit clerk’s office on April 21, 2009.

. It is unclear from the record why the circuit court issued an order granting the motion to withdraw four days before the motion was filed.

. Section 13A-9-3(a), Ala.Code 1975, lists several instruments that can form the basis of a second-degree possession-of-a-forged-instrument conviction, including "a check, draft, note or other commercial instrument.” In this case, Shaw was indicted for possessing or uttering forged checks.

. "Although a Rule 32 petitioner is not required to include attachments to his or her petition in order to satisfy the pleading requirements in Rule 32.3 and Rule 32.6(b), when a petitioner does so, those attachments are considered part of the pleadings.” Conner v. State, 955 So.2d 473, 476 (Ala.Crim.App.2006). See also Ex parte Lucas, 865 So.2d 418 (Ala.2002) (attachments to a Rule 32 petition are considered part of the pleadings).