Rel: May 5, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2022-2023

————————————————

### CR-20-0537

————————————————

**Peter Capote**

**v.**

**State of Alabama**

**Appeal from Colbert Circuit Court**
**(CC-16-340.60)**

McCOOL, Judge.

Peter Capote appeals the Colbert Circuit Court's summary dismissal of his Rule 32, Ala. R. Crim. P., petition for postconviction relief. That petition challenged Capote's conviction for capital murder, see § 13A-5-40, Ala. Code 1975, for which he was sentenced to death, and

his conviction for first-degree assault, see § 13A-6-20, Ala. Code 1975, for which he was sentenced to 20 years' imprisonment.

Facts and Procedural History

In 2018, Capote was convicted of murder made capital because it was committed through the use of a deadly weapon while the victim was in a vehicle, see § 13A-5-40(a)(17), Ala. Code 1975, and he was sentenced to death for that conviction. Capote was also convicted of first-degree assault and was sentenced to 20 years' imprisonment for that conviction. In its opinion affirming Capote's convictions and sentences, this Court set forth the facts that gave rise to those convictions:

> "In early 2016 Thomas Hubbard was the leader of the gang Almighty Imperial Gangsters. That gang consisted of Hubbard, Capote, Benjamin Young, De'Vontae Bates, Austin Hammonds, Michael Blackburn, and Trey Hamm. On February 28, 2016, Hubbard's residence was burglarized. Several items were taken during the burglary, including Hamm's Xbox video-game console. Hubbard informed the gang that he was going to find out who had burglarized his house and kill him or her.
>
> "Hammonds and Bates learned that Ki-Jana Freeman was selling an Xbox in an online marketplace. They suggested to Hubbard that Freeman might have been the person that had stolen Hamm's Xbox. The gang held a meeting and decided to kill Freeman if he was responsible for the burglary. The gang formulated a plan in which Hammonds would meet with Freeman to determine if the Xbox Freeman was selling was the one that had been stolen during the burglary.

2

Hammonds contacted Freeman via an instant message on the social-media Web site Facebook, asking if Freeman had a green, Halo Edition Xbox for sale. Freeman and Hammonds exchanged several messages about the Xbox, but they never met to conduct a transaction. Hammonds, though, represented to Hubbard that he had met with Freeman, telling Hubbard that he thought the Xbox Freeman was selling was the one stolen during the burglary.

"On March 1, 2016, Bates contacted Freeman, purportedly seeking to purchase acid, a hallucinogenic drug. Bates and Freeman agreed to meet at 10:00 p.m. at the Spring Creek Apartments. Bates did not go to the apartment complex; instead, Capote, Young, Hubbard, and Hamm went to the complex in a white truck and waited for Freeman to arrive. Bates sent a text message to Freeman asking him for his location and what kind of vehicle he was driving. Freeman responded that he was about to arrive at the apartment complex and that he was driving a blue Ford Mustang automobile. Bates relayed Freeman's response to his fellow gang members in the truck. When he arrived at the apartment complex, Freeman parked his Mustang in the back parking lot near a dumpster. The white truck pulled behind Freeman. Young and Capote got out of the truck and began firing their weapons at the Mustang. After firing multiple rounds, Young and Capote got back in the truck and left. Freeman was shot multiple times and was pronounced dead shortly after arriving at the hospital. Tyler Blythe, Freeman's friend who had ridden with Freeman to the apartment complex, was shot 13 times but survived his injuries.

"During the investigation, law-enforcement officers obtained a video from surveillance cameras at the apartment complex that had recorded the shooting. Hammonds and Bates identified Capote as one of the shooters in the video. Shawn Settles, Hubbard's cellmate at the county jail, gained Hubbard's trust and learned the location of an assault rifle used in the shooting. Settles told law-enforcement officers

3

where they could find the rifle, which led to its recovery. Testing of the rifle and the bullets established that the rifle had been used in the shooting."

Capote v. State, 323 So. 3d 104, 112-13 (Ala. Crim. App. 2020) (footnote omitted).

For defendants who are sentenced to death after August 1, 2017, the time for filing a Rule 32 petition is governed by the Fair Justice Act ("the FJA"), codified at § 13A-5-53.1, Ala. Code 1975.[1] In pertinent part, the FJA states:

"(b) Post-conviction remedies sought pursuant to Rule 32 of the Alabama Rules of Criminal Procedure in death penalty cases shall be pursued concurrently and simultaneously with the direct appeal of a case in which the death penalty was imposed. …

"(c) A circuit court shall not entertain a petition for post-conviction relief from a case in which the death penalty was imposed on the grounds specified in Rule 32.1(a) of the Alabama Rules of Criminal Procedure unless the petition, including any amendments to the petition, is filed within 365 days of the filing of the appellant defendant's first brief on direct appeal of a case in which the death penalty was imposed pursuant to the Alabama Rules of Appellate Procedure.

"(d) A circuit court, before the filing date applicable to the defendant under subsection (c), for good cause shown and after notice and an opportunity to be heard from the Attorney

---

[1]The FJA does not apply retroactively to defendants who were sentenced to death on or before August 1, 2017. § 13A-5-53.1(j).

General, or other attorney representing the State of Alabama, may grant one 90-day extension that begins on the filing date applicable to the defendant under subsection (c)."

In this case, Capote filed the initial brief for his direct appeal on April 5, 2019, and the Rule 32 petition he desired to file sought relief under Rule 32.1(a) by asserting ineffective-assistance-of-counsel claims. See Ex parte Pierce, 851 So. 2d 606, 614 (Ala. 2000) ("Rule 32.1(a) is the … provision that allows a defendant to raise an ineffective-assistance-of-counsel claim in a postconviction proceeding."). Thus, pursuant to § 13A-5-53.1(c), Capote was required to file his Rule 32 petition within 365 days of April 5, 2019. However, pursuant to § 13A-5-53.1(d), Capote sought and was granted a 90-day extension, which extended the deadline for filing the petition to July 6, 2020.[2]

On July 1, 2020, Capote filed his Rule 32 petition with the assistance of counsel. As a threshold matter, Capote's counsel requested a stay of the Rule 32 proceedings, arguing that they had "not yet had a full opportunity to investigate Capote's case and prepare a Rule 32 petition that present[ed] all of his claims." (C. 24.) In support of that

---

[2]The 90-day period actually expired on July 4, 2020, which was a Saturday. Thus, the deadline for filing the petition was extended to July 6, 2020. See Rule 1.3, Ala. R. Crim. P.

argument, Capote's counsel, who are based in New York, claimed that they "took on [Capote's] postconviction representation" (C. 6) "in late February 2020" (C. 231), "just as the COVID-19 pandemic hit" (C. 6), and that, as a result of the pandemic, they had been unable to "travel[ ] to Colbert County to interview people" (C. 7) or to have confidential telephone conversations with Capote because his prison calls were monitored. Capote's counsel noted, though, that "[w]hat [they] had seen to date" in their "careful review of the trial record" indicated that Capote's trial counsel had not provided him with effective representation, and they raised multiple ineffective-assistance-of-counsel claims based upon that review, with the caveat that they "suspect[ed] that there [were] still more shortcomings to bring to the [circuit court's] attention." (Id.)

On July 14, 2020, the State filed an opposition to Capote's request for a stay of the Rule 32 proceedings, arguing that the circuit court had no power to issue a stay because, the State said, the FJA "does not contemplate the granting of stays." (C. 29.) Alternatively, the State argued that Capote "was first assigned Rule 32 counsel in June 2018" and had "had consistent Rule 32 counsel since at least July 9, 2019." (C. 30.) Thus, according to the State, Capote had "had over two years in

which to investigate and pursue his Rule 32 claims" and had "been represented by counsel" during "the majority of that time." (Id.) The State also filed an answer to Capote's petition, arguing that his claims were due to be summarily dismissed because they were insufficiently pleaded or were without merit.

On March 15, 2021, the State filed a motion seeking a ruling on Capote's petition, noting that, pursuant to the FJA, the circuit court was required to rule on Capote's petition within 180 days of the date the certificate of judgment issued in his direct appeal, see § 13A-5-53.1(e), and that the deadline would expire in two days. The next day, the State submitted a proposed order summarily dismissing Capote's petition, and, the following day, the circuit court adopted the proposed order verbatim. The circuit court's order did not acknowledge Capote's request for a stay. Capote subsequently filed a motion to reconsider in which he argued, among other arguments, that, by adopting the State's proposed order verbatim, the circuit court had "failed to provide an independent review of the issues." (C. 231.) The circuit court did not rule on that motion, and Capote filed a timely notice of appeal.

## Discussion

7

On appeal, Capote raises multiple claims that, he says, require this Court to reverse the summary dismissal of his Rule 32 petition.

I.

Capote first argues that the circuit court erred by adopting verbatim the State's proposed order dismissing his Rule 32 petition. In support of that argument, Capote cites Ex parte Ingram, 51 So. 3d 1119 (Ala. 2010), in which the Alabama Supreme Court addressed the same claim. In reversing this Court's decision affirming the circuit court's order in that case, the Alabama Supreme Court stated:

> "[T]he general rule is that, where a trial court does in fact adopt the [State's] proposed order as its own, deference is owed to that order in the same measure as any other order of the trial court. In Dobyne v. State, 805 So. 2d 733, 741 (Ala. Crim. App. 2000), the Court of Criminal Appeals stated:
>
>> "'"'While the practice of adopting the [S]tate's proposed findings and conclusions is subject to criticism, the general rule is that even when the court adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous.'"'
>
> "805 So. 2d at 741 (quoting other cases; emphasis added). In McGahee v. State, 885 So. 2d 191, 229-30 (Ala. Crim. App. 2003), the Court of Criminal Appeals stated that 'even when a trial court adopts verbatim a party's proposed order, the findings of fact and conclusions of law are those of the trial court and they may be reversed only if they are clearly erroneous.' Cf. United States v. El Paso Natural Gas Co., 376

U.S. 651, 656, 84 S. Ct. 1044, 12 L. Ed. 2d 12 (1964) (expressing disapproval of the 'mechanical' adoption of findings of fact prepared by a party, but stating that such findings are formally those of the trial judge and 'are not to be rejected out-of-hand').

"In this unusual case, however, we cannot conclude that the above-stated 'general rule' is applicable. That is, despite the fact that [Judge William E. Hollingsworth] signed the June 8 order, we cannot conclude that the findings and conclusions in that order are in fact those of the court itself.

"The June 8 order begins as follows:

"'Having considered the first amended Rule 32 petition presented to the Court, the State of Alabama's amended answer, the State of Alabama's motions to dismiss, the evidence presented at trial, and the events within the personal knowledge of the Court, the Court makes the following findings of fact and conclusions of law and summarily dismisses and denies the claims in Ingram's first amended Rule 32 petition.'

"(Emphasis added.) After a rendition of the facts of the case, the June 8 order states:

"'The findings by the Court of Criminal Appeals [on direct appeal of Ingram's conviction] guide the Court in its resolution of the issues presented in the first amended Rule 32 petition. The Court is also relying on the trial transcript where necessary to support the Court's findings and the resolution of this Rule 32 petition. In addition, this Court presided over Ingram's capital murder trial and personally observed the performance of both lawyers throughout Ingram's trial and sentencing.'

"(Emphasis added.)

"The obvious problem with the emphasized portions of the above-quoted passages from the June 8 order is that Judge [Jerry L.] Fielding, not Judge Hollingsworth, presided over Ingram's capital-murder trial. Although minor factual errors understandably find their way into orders drafted by trial courts in handling busy dockets, an error as to whether the judge in fact sat as the trial judge in a capital-murder trial and is basing his decision on personal observations and personal knowledge acquired by doing so is the most material and obvious of errors.

"....

"We are forced by the nature of the errors present in the June 8 order to reverse the judgment of the Court of Criminal Appeals. In the simplest terms, the patently erroneous nature of the statements regarding the trial judge's 'personal knowledge' and observations of Ingram's capital-murder trial undermines any confidence that the trial court's findings of fact and conclusions of law are the product of the trial judge's independent judgment and that the June 8 order reflects the findings and conclusions of that judge."

Ex parte Ingram, 51 So. 3d at 1122-25.

Capote argues that the circuit court's order in this case "include[s] the same 'patently erroneous' statement regarding the judge's having presided over the trial and having 'personal knowledge of the underlying facts' that led the [Alabama Supreme] Court to reverse in Ex parte Ingram." (Capote's brief, p. 17 (quoting Ex parte Ingram, 51 So. 3d at

10

1125).) In support of that argument, Capote notes that Judge Harold Hughston, Jr., presided over his trial and that Judge Jacqueline Hatcher ruled on his Rule 32 petition, yet the order dismissing his petition includes the following language:

> "Finally, 'a judge who presided over the trial or other proceeding and observed the conduct of the attorneys at the trial or other proceeding need not hold a hearing on the effectiveness of those attorneys based upon conduct that he observed.' Ex parte Hill, 591 So. 2d 462, 463 (Ala. 1991). This provision is applicable in the present matter. Thus, in assessing Capote's claims, 'if [this Court] has personal knowledge of the actual facts underlying the allegations in the petition, he may deny the petition without further proceedings so long as he states the reasons for the denial in a written order.' Boyd [v. State], 913 So. 2d [1113,] 1126 [(Ala. Crim. App. 2003)]."[3]

(C. 188.)

It is true that Judge Hatcher's order acknowledges the principle that a judge who presided over a defendant's trial can summarily dismiss an ineffective-assistance-of-counsel claim based upon the judge's personal observation of counsel's performance. It is also true that the order states that "[t]his provision is applicable in the present matter,"

---

[3]Capote notes that the same language from Ex parte Hill, 591 So. 2d 462 (Ala. 1991), that was quoted in this part of the order was repeated once later in the order.

11

despite the fact that Judge Hatcher did not preside over Capote's trial. However, nowhere in the order did Judge Hatcher state that she had in fact presided over Capote's trial or that she had based her decision on her personal knowledge of his counsel's performance. To the contrary, the order states that Judge Hatcher's findings were based on "the pleadings filed in this matter" (C. 182) and "the face of the record." (C. 194.) In addition, we note that the language Capote cites is included in a part of the order that sets forth other general principles of law that are typically applicable in Rule 32 proceedings. (C. 185-88.) We also note that the statement "[t]his provision is applicable in the present matter" is qualified by the next sentence, which states that Judge Hatcher could deny Capote's petition without further proceedings if she had personal knowledge of his counsel's performance. Thus, we disagree with Capote's argument that the circuit court's order in this case contains the same "patently erroneous" statements that were present in Ex parte Ingram. Id. at 1125, where the judge's order unequivocally stated that he had presided over the petitioner's trial, that he had personally observed the performance of the petitioner's counsel, and that he had based his

12

findings in part on the knowledge he had gleaned from those observations.

Capote notes, though, that the Alabama Supreme Court has clarified that Ex parte Ingram "should not be read as entitling a petitioner to relief in only those factual scenarios similar to those presented in [that case]." Ex parte Jenkins, 105 So. 3d 1250, 1260 (Ala. 2012).  Instead, the Court has explained: "A Rule 32 petitioner would be entitled to relief in any factual scenario when the record before [the reviewing] Court clearly establishes that the order signed by the trial court denying postconviction relief is not the product of the trial court's independent judgment." Id.  However, the only additional facts Capote cites in support of this claim are that the State submitted the 49-page proposed order at 4:26 p.m. on March 16, 2021, and that the circuit court signed the order the following day.  But the mere fact that a circuit court adopts a State's proposed order, even a somewhat lengthy one, the day after the proposed order was submitted to the court is not a fact that "clearly establishes" that the court's order was not the product of the court's independent judgment.  Ex parte Jenkins, 105 So. 3d at 1260.  See Mashburn v. State, 148 So. 3d 1094 (Ala. Crim. App. 2013) (affirming the

circuit court's verbatim adoption of the State's 65-page proposed order, which the court adopted two days after the State submitted it).

In short, the circuit court's order in this case does not contain the same "patently erroneous" statements that were present in Ex parte Ingram, id. at 1125, and there is nothing in the record that "clearly establishes" that the order was not the product of the court's independent judgment. Ex parte Jenkins, 105 So. 3d at 1260 (emphasis added). In the absence of such evidence, "deference is owed to that order in the same measure as any other order of the [circuit] court." Ex parte Ingram, 51 So. 3d at 1122. Thus, Capote is not entitled to relief on this claim. See Lee v. State, 244 So. 3d 998, 1002 (Ala. Crim. App. 2017) (affirming the circuit court's verbatim adoption of the State's proposed order because the court's order "contain[ed] no patently erroneous statements as was the case in Ex parte Ingram" and there was no indication in the record that the order "was anything but the court's own independent judgment").

## II.

Capote next argues that the circuit court erred by refusing to grant his request for a stay of the Rule 32 proceedings. Although the circuit

14

court did not expressly rule on that request, Capote interprets the court's summary dismissal of his petition as an implicit denial of the request. (Capote's brief, p. 20.) In addressing this claim, we are mindful of the fact that a circuit court has broad discretion in determining whether to grant a request for a stay. Ex parte Doe, 344 So. 3d 877, 879 (Ala. 2021).

The basis for Capote's request for a stay was that his counsel had "not yet had a full opportunity to investigate [his] case and prepare a Rule 32 petition that present[ed] all of his claims" because his counsel did not enter the case until "late February 2020," "just as the COVID-19 pandemic hit." The State's response was that a stay was unwarranted because Capote "was first assigned Rule 32 counsel in June 2018" and had "had consistent Rule 32 counsel since at least July 9, 2019." Thus, according to the State, at the time Capote requested a stay, he had "had over two years in which to investigate and pursue his Rule 32 claims" and had "been represented by counsel" during "the majority of that time."

Capote has not disputed – either below or on appeal – that he was first appointed Rule 32 counsel in June 2018 and that he has had consistent Rule 32 counsel since July 2019. In fact, Capote's counsel conceded at oral argument before this Court that, at the time they

15

requested a stay, Capote had been represented by Rule 32 counsel for approximately two years. Thus, it appears to be undisputed that, at the time Capote's counsel entered the case in February 2020, Capote had been represented by other Rule 32 counsel for approximately 20 months and had been represented by consistent Rule 32 counsel for the previous 7 months, which was ample time for his former counsel to investigate his case for potentially viable postconviction claims.

Capote argues, however, that his former Rule 32 counsel "took no action on his behalf" – an alleged fact that, he says, "is not surprising" because "few post-conviction lawyers would have sprung into action" before his direct appeal was resolved. (Capote's brief, pp. 21-22.) But Capote never raised this argument below, even after the State made a point of drawing the circuit court's attention to the fact that Capote had long been represented by other Rule 32 counsel before his current counsel entered the case. "We cannot consider evidence or factual assertions that were not presented to the [circuit] court before it made its determination on [Capote's request for a stay]." Ex parte Alabama Dep't of Labor, 214 So. 3d 356, 360 (Ala. Civ. App. 2015). See also Magwood v. State, 494 So. 2d 124, 138 n.3 (Ala. Crim. App. 1985) (considering only those facts that

16

were presented to the trial court in reviewing the court's denial of a motion to suppress); and Moore v. Mikul, [No. 1200671, Jan. 21, 2022] ___ So. 3d ___, ___ (Ala. 2022) ("'This Court cannot consider arguments advanced for the purpose of reversing the judgment of a trial court when those arguments were never presented to the trial court for consideration or were raised for the first time on appeal.'" (quoting State Farm Mut. Auto. Ins. Co. v. Motley, 909 So. 2d 806, 821 (Ala. 2005))). To hold that a circuit court exceeded its discretion in refusing to issue a stay based on facts that were never presented to the court would fly in the face of this rule.

Given the facts that were presented to the circuit court, the court could have reasonably concluded that Capote's former Rule 32 counsel had been actively investigating his case for anywhere from 7 to 20 months before his current counsel entered the case. Indeed, although Capote argues that "few post-conviction lawyers would have sprung into action" before his direct appeal was resolved, the FJA requires that a Rule 32 petition in a death-penalty case "shall be pursued concurrently and simultaneously with the direct appeal." § 13A-5-53.1(b). Thus, because Capote never alleged that his former Rule 32 counsel had

17

"t[aken] no action on his behalf," there was every reason for the circuit court to believe that his former counsel had actively investigated his case. And there was no reason for the circuit court to believe that Capote's current counsel could not have consulted with his former Rule 32 counsel to learn of any potentially viable postconviction claims that former counsel had discovered. Moreover, despite Capote's claim that his current counsel had "not yet had a full opportunity to investigate [his] case," they were able to raise multiple ineffective-assistance-of-counsel claims that they had discovered from their review of the record. For those reasons, we cannot say that the circuit court exceeded its broad discretion by refusing to issue a stay of the Rule 32 proceedings so that Capote's current counsel could further investigate the case. Thus, Capote is not entitled to relief on this claim.

## III.

Capote's final argument is that the circuit court erred by summarily dismissing his ineffective-assistance-of-counsel claims. Because the circuit court based its ruling on a "'cold trial record,' we apply a de novo standard of review" in determining whether summary dismissal of Capote's claims was proper. Harris v. State, [Ms. CR-19-0231, July 9,

2021] ___ So. 3d ___, ___ (Ala. Crim. App. 2021) (quoting <u>Ex parte Hinton</u>,

172 So. 3d 348, 352 (Ala. 2012)).

> "To prevail on a claim of ineffective assistance of counsel, the petitioner must meet the standard articulated by the United States Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The petitioner must show: (1) that counsel's performance was deficient, and (2) that the petitioner was prejudiced by his counsel's deficient performance. 466 U.S. at 687, 104 S. Ct. 2052. 'To meet the first prong of the test, the petitioner must show that his counsel's representation fell below an objective standard of reasonableness. The performance inquiry must be whether counsel's assistance was reasonable, considering all the circumstances.' <u>Ex parte Lawley</u>, 512 So. 2d 1370, 1372 (Ala. 1987). '"This court must avoid using 'hindsight' to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel's actions before determining whether counsel rendered ineffective assistance."' <u>Lawhorn v. State</u>, 756 So. 2d 971, 979 (Ala. Crim. App. 1999) (quoting <u>Hallford v. State</u>, 629 So. 2d 6, 9 (Ala. Crim. App. 1992)). 'A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' <u>Strickland</u>, 466 U.S. at 689, 104 S. Ct. 2052. As the United States Supreme Court explained:
>
>> "'Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of

hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'

"Strickland, 466 U.S. at 689, 104 S. Ct. 2052 (citations omitted). To meet the second prong of the test, the petitioner 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' 466 U.S. at 694, 104 S. Ct. 2052. 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Id. 'It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.' Id. at 693, 104 S. Ct. 2052. 'The likelihood of a different result must be substantial, not just conceivable.' Harrington v. Richter, 562 U.S. 86, 112, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

"Rule 32.3, Ala. R. Crim. P., provides that '[t]he petitioner shall have the burden of pleading ... the facts necessary to entitle the petitioner to relief.' Rule 32.6(b), Ala. R. Crim. P., requires that the petition 'contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.' As this Court noted in Boyd v. State, 913 So. 2d 1113 (Ala. Crim. App. 2003):

"'"Rule 32.6(b) requires that the <u>petition</u> itself disclose the <u>facts</u> relied upon in seeking relief." <u>Boyd v. State</u>, 746 So. 2d 364, 406 (Ala. Crim. App. 1999). In other words, it is not the pleading of a <u>conclusion</u> "which, if true, entitle[s] the petitioner to relief." <u>Lancaster v. State</u>, 638 So. 2d 1370, 1373 (Ala. Crim. App. 1993). It is the allegation of <u>facts</u> in pleading which, if true, entitle a petitioner to relief. After <u>facts</u> are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R. Crim. P., to present evidence proving those alleged facts.'

"913 So. 2d at 1125.

"'The burden of pleading under Rule 32.3 and Rule 32.6(b) is a heavy one. Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The full factual basis for the claim must be included in the petition itself. If, assuming every factual allegation in a Rule 32 petition to be true, a court cannot determine whether the petitioner is entitled to relief, the petitioner has not satisfied the burden of pleading under Rule 32.3 and Rule 32.6(b). See <u>Bracknell v. State</u>, 883 So. 2d 724 (Ala. Crim. App. 2003). To sufficiently plead an allegation of ineffective assistance of counsel, a Rule 32 petitioner not only must "identify the [specific] acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," <u>Strickland v. Washington</u>, 466 U.S. 668, 690, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), but also must plead specific facts indicating that he or she was prejudiced by the acts or omissions, i.e., facts indicating "that there is a

21

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S. Ct. 2052. A bare allegation that prejudice occurred without specific facts indicating how the petitioner was prejudiced is not sufficient.'

"Hyde v. State, 950 So. 2d 344, 356 (Ala. Crim. App. 2006)."

Stanley v. State, 335 So. 3d 1, 22-24 (Ala. Crim. App. 2020).

"Rule 32.7(d), Ala. R. Crim. P., authorizes the circuit court to summarily dismiss a petitioner's Rule 32 petition

"'[i]f the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings ...'

"See also Hannon v. State, 861 So. 2d 426, 427 (Ala. Crim. App. 2003); Cogman v. State, 852 So. 2d 191, 193 (Ala. Crim. App. 2002); Tatum v. State, 607 So. 2d 383, 384 (Ala. Crim. App. 1992). In addition, '"'[w]here a simple reading of the petition for post-conviction relief shows that, assuming every allegation of the petition to be true, it is obviously without merit or is precluded, the circuit court [may] summarily dismiss that petition.'"' Bryant v. State, 181 So. 3d 1087, 1102 (Ala. Crim. App. 2011) (quoting Bishop v. State, 608 So. 2d 345, 347-48 (Ala. 1992) (quoting in turn Bishop v. State, 592 So. 2d 664, 667 (Ala. Crim. App. 1991) (Bowen, J., dissenting))). Summary disposition is also appropriate where the record directly refutes a Rule 32 petitioner's claim."

Shaw v. State, 148 So. 3d 745, 764-65 (Ala. Crim. App. 2013). With these principles in mind, we address the circuit court's summary dismissal of

Capote's ineffective-assistance-of-counsel claims, which the court dismissed on the basis that they were either insufficiently pleaded or facially without merit.

## A. Guilt-Phase Claims

### 1.

Capote's first ineffective-assistance-of-counsel claim alleged that his counsel (1) acknowledged his affiliation with the Almighty Imperial Gangsters during the opening statement and (2) "elicit[ed] detailed testimony about the activities of the Almighty Imperial Gangsters" while cross-examining three State's witnesses. (C. 14.) According to Capote, by acknowledging his gang affiliation and eliciting evidence of the gang's "activities," his counsel "gave the jury reason to believe that [he] was an incorrigible criminal who was guilty of murder and should not live among them." (Id.)

### a. Defense Counsel's Opening Statement

We first address Capote's allegation that his counsel rendered ineffective assistance by acknowledging his gang affiliation during the opening statement. Specifically, Capote alleged that, even though "the prosecutor did not mention gang affiliation in her opening address," his

23

counsel told the jury "that [Freeman's] murder was in direct response to a burglary, which was an affront to the gang," and that the gang's "original plan was to kidnap, torture, and kill [Freeman]." (C. 13.) However, it was inevitable that Capote's gang affiliation and the reason for Freeman's murder would be established at trial, and indeed they were; as Capote noted on direct appeal, "the State mentioned Capote's gang affiliation more than 40 times during the guilt and penalty phases of trial," Capote, 323 So. 3d at 146, and the State presented evidence indicating that Freeman was murdered because the gang believed he had burglarized its leader's house. (R. 824.) And, although it is true that the State did not present evidence regarding the gang's "original plan" to kidnap and torture Freeman, it was reasonable for Capote's counsel to believe that such evidence would be forthcoming.

"Where defense counsel in opening statement recognizes and candidly asserts the inevitable, he is often serving his client's interests best by bringing out the damaging information and thus lessening the impact." People v. Wise, 134 Mich. App. 82, 98, 351 N.W.2d 255, 263 (1984). Thus, because it appeared inevitable that the State would present evidence of Capote's gang affiliation and the gang's "plans" for

24

Freeman, "an attorney exercising professional skill and judgment could reasonably have concluded that the best strategy was to be candid from the start about the evidence that the jury would likely hear." <u>Rudnitskyy v. State</u>, 303 Or. App. 549, 558, 464 P.3d 471, 478 (2020). <u>See</u> <u>State v. Taylor</u> (No. 12AP-870, Aug. 27, 2013) (Ohio Ct. App. 2013) (unpublished decision) ("This court will not second-guess what appears to have been a tactical decision made by defense counsel to foreclose the sting of appellant's alleged gang affiliation by mentioning it in opening statement … when defense counsel reasonably could anticipate its admission at trial.")[4]; <u>Torres v. Lopez</u>, (No. CV-10-3537, Dec. 18, 2014) (C.D. Cal. 2014) (not reported in Federal Supplement) (concluding that counsel had made "the sort of strategic decision to which reviewing courts must accord deference" by choosing to acknowledge during the opening statement that the defendant had once been a member of a gang because "[c]ounsel was merely acknowledging what would become, given the evidence, plainly obvious during trial").

---

[44]In Ohio, unpublished decisions of the Court of Appeals issued after May 1, 2002, may be cited as legal authority. <u>See</u> Rule 3.4, Ohio Supreme Court Rules for the Reporting of Opinions.

As the United States Supreme Court has explained, a defendant has failed to establish deficient performance by his counsel when "the challenged action 'might be considered sound trial strategy.'" Strickland v. Washington, 466 U.S. 668, 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). See also State v. Ray, 469 P.3d 871, 876-77 (Utah 2020) ("If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance." (citing Strickland, supra)). Given the circumstances of this case, counsel's decision during the opening statement to acknowledge Capote's gang affiliation and the gang's "plans" for Freeman could be considered sound trial strategy. Thus, Capote failed to establish that his counsel performed deficiently during the opening statement, and summary dismissal of this claim was therefore proper. Shaw, 148 So. 3d at 764-65. See also Miller v. State, 1 So. 3d 1073, 1078 (Ala. Crim. App. 2007) (holding that summary dismissal was proper because the facts the petitioner pleaded, even if true, did not establish that his counsel had performed deficiently); and Stallworth v. State, 171 So. 3d 53, 79 (Ala. Crim. App. 2013) ("'A trial court may summarily dismiss a post-conviction petition [on a claim of

ineffective assistance of counsel] when it is clear upon the face of the petition itself … that there are no facts upon which the petitioner could prevail.'" (quoting Fairley v. State, 812 So. 2d 259, 262 (Miss. Ct. App. 2002))).

b. Defense Counsel's Cross-Examination

We next address Capote's allegation that his counsel rendered ineffective assistance by "eliciting detailed testimony about the activities of the Almighty Imperial Gangsters" while cross-examining three State's witnesses. Specifically, Capote alleged that his counsel elicited testimony "that the gang met every Thursday night"; "that dues were $7 every week"; "that the gang sold marijuana to support itself"; that the gang's "original plan was to kidnap [Freeman], torture him, cut his fingers off, and kill him"; "that two gang members [(other than Capote)] had stolen the [assault] rifle" used in Freeman's murder; "that the gang was trying to be like the Crips and Bloods"; that the gang's leader had come from a gang in Chicago; "that one person had left the gang" and the gang was "still looking for him"; that the gang's "sign" is a diamond; that Capote provided younger gang members with marijuana to sell; that Capote and another gang member had stolen the white truck that had

carried the two shooters to the scene of Freeman's murder; and that, a few days before Freeman's murder, two gang members (other than Capote) had been "ripped off" in a drug deal, which had resulted in "a gunfight." (C. 13-14.) As noted, Capote alleged that, by eliciting such testimony, his counsel "gave the jury reason to believe that [he] was an incorrigible criminal who was guilty of murder and should not live among them."[5]

Initially, we note that "'"[t]he method and scope of cross-examination 'is a paradigm of the type of tactical decision that [ordinarily] cannot be challenged as evidence of ineffective assistance of counsel.'"'" Stanley, 335 So. 3d at 37 (quoting Davis v. State, 44 So. 3d 1118, 1135 (Ala. Crim. App. 2009), quoting in turn State ex rel. Daniel v. Legursky, 195 W. Va. 314, 328, 465 S.E.2d 416, 430 (1995), quoting in turn Hutchins v. Garrison, 724 F.2d 1425, 1436 (4th Cir. 1983)). See also

---

[5]Some of the testimony Capote cited reflected negatively on him specifically – namely, that he provided younger gang members with marijuana to sell and that he had been involved in the theft of the white truck. However, Capote's argument was not that his counsel rendered ineffective assistance by eliciting testimony of his collateral acts. See Rule 404(b), Ala. R. Evid. Instead, Capote's argument was that his counsel rendered ineffective assistance by eliciting testimony of the "activities" of the Almighty Imperial Gangsters as a whole.

28

A.G. v. State, 989 So. 2d 1167, 1173 (Ala. Crim. App. 2007) ("'[D]ecisions regarding whether and how to conduct cross-examinations and what evidence to introduce are matters of trial strategy and tactics.'" (quoting Rose v. State, 258 Ga. App. 232, 236, 573 S.E.2d 465, 469 (2002))). Regardless, even if we assume that the scope of counsel's cross-examination was objectively unreasonable in this case, which we do not, Capote cannot demonstrate that he was prejudiced by the cross-examination because "there is [not] a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. See Bryant v. State, 181 So. 3d 1087, 1165 n.13 (Ala. Crim. App. 2011) (opinion on return to remand) ("Because we conclude that Bryant was not prejudiced, we need not specifically address whether counsel's performance was deficient.").

First, we reiterate that Capote's gang affiliation permeated the trial, and some of the testimony regarding the gang's "activities" was wholly innocuous, such as its meeting schedule, its weekly dues, the fact that its "sign" is a diamond, and the fact that its leader had come from Chicago. There is little to no chance, and certainly not a reasonable probability, that this testimony influenced the jury's verdict. It is true

that the rest of the testimony Capote cited tended to indicate that the gang was generally involved in violence, illicit drugs, and theft, but that fact likely would have come as no surprise to the jury. As the Louisiana Supreme Court has observed, "it is common knowledge that gang members engage in drug-related and violent crimes," and, thus, evidence to that effect would "hardly be … surprising to the jury." State v. Cooks, 720 So. 2d 637, 650 (La. 1998). See also United States v. Wright, (No. 02-00116-03, Aug. 29, 2006) (W.D. Mo. 2006) (not reported in Federal Supplement) (noting that the fact that "drug deals or violence are symptomatic of gangs … falls within the realm of [a juror's] common sense conclusions"). Moreover, the State presented evidence indicating that the gang was prone to violence and involved with illicit drugs.

Furthermore, there was substantial evidence of Capote's guilt, and that evidence was not circumstantial. Freeman's murder was captured on a surveillance-camera video, and two other gang members identified Capote as one of the two shooters on the video. Granted, as suspects themselves, those gang members had incentive to pin the murder on Capote, but the State also introduced a handwritten letter Capote had

30

sent to the gang's leader while they were incarcerated together, and Capote admitted in that letter that he had killed Freeman. (R. 1219.)

In short, Capote's gang affiliation was well established by the State's evidence; the State's evidence indicated that the gang was prone to violence and involved with illicit drugs; the jurors' common sense would have told them that the gang was likely involved in criminal conduct; and there was substantial evidence of Capote's guilt, including his confession to another gang member. Given those facts, there is not a reasonable probability that the jury would have reached a different verdict in the absence of testimony regarding some of the gang's specific "activities." Thus, even if it was objectively unreasonable for Capote's counsel to elicit such testimony – and we do not suggest that it was – Capote cannot establish that he was prejudiced by the allegedly deficient performance. See Ex parte Martinez, 330 S.W.3d 891, 904 (Tex. Crim. App. 2011) (holding that, given the "ample evidence" of the defendant's guilt, it was "unlikely … that the jury would have reached a different conclusion in the absence of the gang-related evidence"); and Henderson v. Cockrell, 333 F.3d 592, 603 (5th Cir. 2003) (holding that there was "not a reasonable probability that the evidence of [the defendant's] gang

affiliation affected the outcome of the ... trial," especially given "the extremely strong evidence of his guilt, including his confession to his cellmate"). Accordingly, summary dismissal of this claim was proper. See Wimbley v. State, [Ms. CR-20-0201, Dec. 16, 2022] ___ So. 3d ___, ___ (Ala. Crim. App. 2022) ("Because Wimbley cannot establish prejudice under Strickland, the circuit court properly dismissed this claim.").

2.

Capote's second ineffective-assistance-of-counsel claim alleged that his counsel "conducted a cursory voir dire that fell far below the standard expected from a competent lawyer in a capital case." (C. 15.) In support of that claim, Capote alleged only the following facts: "The entire voir dire covers less than 60 pages of the trial transcript and is anything but probing. The questions are general, and the answers reveal little." (Id. (citations to record omitted).)

In Stanley, supra, the appellant raised a similar claim, arguing that his counsel "conducted only 'a cursory voir dire examination covering a mere 20 transcript pages.'" Stanley, 335 So. 3d at 47 (citation to record omitted). This Court held that the appellant's claim was insufficiently pleaded, however, because he had "failed to allege in his petition what

specific questions he believed counsel should have asked or what responses he thought he would have received to such questions." Id. at 48. The Court reached the same conclusion in Bryant, supra, holding that the appellant's claim was insufficiently pleaded because he had "failed to specifically identify what additional questions he believe[d] counsel should have asked the venire." Bryant, 181 So. 3d at 1107.

Like the appellants in Stanley and Bryant, Capote did not identify in his petition the specific questions he believed his counsel should have asked during voir dire. Thus, Capote failed to plead this claim with the specificity required by Rule 32.3 and Rule 32.6(b), and summary dismissal of the claim was therefore proper. Shaw, 148 So. 3d at 764.

3.

Capote's third ineffective-assistance-of-counsel claim alleged that his counsel "failed to ensure that the instructions provided to the jury accurately stated the law." (C. 15.) Specifically, Capote alleged that his counsel should have objected to the trial court's capital-murder instruction because, he said, "the jury was not properly instructed that

the critical element of capital murder is that the defendant have a specific intent to kill."[6] (Id.)

On direct appeal, Capote raised the underlying claim upon which this ineffective-assistance-of-counsel claim is based, i.e., that the trial court "failed to instruct the jury that capital murder requires a real and specific intent to kill." Capote, 323 So. 3d at 129. Capote also argued that this alleged error was compounded by the trial court's accomplice-liability instruction, which, he argued, allowed the jury to convict him of capital murder under the felony-murder standard. Because Capote did not object to the jury instructions, this Court reviewed his claim for plain error and found none because, we reasoned, there was "no reasonable likelihood that the jurors applied the challenged instructions in an improper manner." Id. at 131.

---

[6]Capote also alleged that his counsel should have objected to the trial court's reasonable-doubt instruction, which, he said, "deviated from the Alabama Pattern Jury Instruction and did so in ways that eased the prosecution's burden." (C. 15.) We do not consider that claim, however, because Capote has not reasserted it on appeal, and it is thus deemed abandoned. See Brownfield v. State, 266 So. 3d 777, 795 n.8 (Ala. Crim. App. 2017) ("Those claims of ineffective assistance of trial counsel raised in Brownfield's petition but not pursued on appeal are deemed abandoned and will not be considered by this Court.").

In Ex parte Taylor, 10 So. 3d 1075, 1078 (Ala. 2005), the Alabama Supreme Court explained that "a determination on direct appeal that there has been no plain error does not automatically foreclose a determination of the existence of the prejudice required under Strickland to sustain a claim of ineffective assistance of counsel." "However, Ex parte Taylor applies only to the prejudice prong of Strickland, not to the deficient-performance prong." Woodward v. State, 276 So. 3d 713, 769 (Ala. Crim. App. 2018). Thus, where "this Court's holding on direct appeal establishes that counsel's performance was not deficient, Ex parte Taylor is inapplicable." Id.

In holding on direct appeal that there was no plain error in the jury instructions, this Court held that the instructions, taken as a whole, had "properly apprised the jury of the elements of capital murder." Capote, 323 So. 3d at 131. In other words, this Court has already held that the trial court's capital-murder instruction accurately informed the jury of the specific intent required for a capital-murder conviction. That holding, by extension, establishes that there is no merit to the objection that Capote's counsel allegedly should have raised, and it is well settled that counsel cannot be deemed ineffective for failing to raise a meritless

35

objection. Van Pelt v. State, 202 So. 3d 707, 732 (Ala. Crim. App. 2015). In short, then, this Court's holding on direct appeal establishes that Capote's counsel did not perform deficiently by not objecting to the trial court's capital-murder instruction. Thus, summary dismissal of this claim was proper. See Woodward, 276 So. 3d at 769 (holding that summary dismissal of an ineffective-assistance-of-counsel claim was proper because "this Court's holding on direct appeal establishe[d] that counsel's performance was not deficient").

4.

Capote's fourth ineffective-assistance-of-counsel claim alleged that his counsel failed to object to the admission of autopsy photographs, particularly photographs that showed Freeman's "lungs after they were removed from his body" and "his rib cage and chest cavity with all of his organs taken out." (C. 15.) On direct appeal, however, this Court held that the autopsy photographs were admissible, even though they were "unpleasant to view," because they tended to "show the extent of the wounds to Freeman's body." Capote, 323 So. 3d at 126. Thus, this Court has already determined that there is no merit to the objection that Capote's counsel allegedly should have raised, and, as we have just noted,

36

counsel cannot be deemed ineffective for failing to raise a meritless objection. Van Pelt, 202 So. 3d at 732. Accordingly, summary dismissal of this claim was proper. See Carruth v. State, 165 So. 3d 627, 641-42 (Ala. Crim. App. 2014) (holding that summary dismissal was proper because the objection that counsel allegedly should have raised had no merit, given that the prosecutor's allegedly objectionable comments were permissible).

## B. Penalty-Phase Claims

### 1.

Capote's fifth ineffective-assistance-of-counsel claim alleged that his counsel "failed to stop [Jay Currin, Capote's half-brother,] when [Currin] went off the rails" while testifying about their mother during the penalty phase. (C. 17.) Specifically, Capote alleged that his counsel allowed Currin to provide more "profanity-laced testimony" than "has [ever] before been uttered in an Alabama court." (C. 16.) In support of that claim, Capote alleged the following facts:

> "Currin testified that his mother 'wanted to fucking take it out on [Currin and Capote]; that she 'wasn't a fucking parent'; that 'she was a piece of shit'; that one day she 'ditched [Currin's] ass at a Waffle House with a fucking paper bag . . . and fucking took off'; that she 'was just a lying ass motherfucker that didn't want to own up to her own

37

responsibilities'; and that she 'ma[de] [Currin] kneel in rice and fucking chok[ed] him against the wall ... beating the fuck out of [him] whenever she could get her hands on [him].' 'Who the fuck needs that kind of shit as a kid,' he asked the jury."

(Id. (citations to record omitted).) According to Capote, Currin's consistent profanity "could not have sat well with [the jury]" and "left the jury thinking that even the 'good brother' (Currin) was out of control." (C. 17.)

We know of no authority, and Capote has cited no authority, that imposed a duty on his counsel to control Currin's profanity. In fact, we note that it is generally the trial court – not counsel – that has the duty to control a witness's behavior. See Grayson v. State, 824 So. 2d 804, 841 (Ala. Crim. App. 1999) (noting the trial court's "'inherent authority ... to control the conduct of the proceedings before it, in order to ensure that the proper decorum and appropriate atmosphere are established'" (quoting Hicks-Bey v. United States, 649 A.2d 569, 575 (D.C. App. 1994))); and Lawson v. State, 274 Ind. 419, 431, 412 N.E.2d 759, 768 (1980) (noting "the trial court's duty to manage and control the proceedings," which "obviously extends to the potentially disruptive behavior of ... witnesses").

Regardless, it appears that Capote's counsel made a strategic decision to allow Currin to use profanity throughout his testimony. During closing arguments, counsel argued:

> "You heard from Jay Currin, and that's some of the most compelling, truthful, heartfelt, gut-wrenching – and I know it was vile. I know it was profane. I've never heard – in 36 years, I've never heard anybody talk like that in the courtroom, but he was truthful and he was honest. And that's the way he feels about [his mother] for the circumstances that he was put in. ….

> "… [Currin is] carrying a burden in his heart and in his soul and a hatred for his mother that he will never get over, not without years of serious counseling. You saw it, you felt it. It was true. It was raw. It was emotional. And it was the truth."

(R. 1994-95.)

As evidenced by that argument, it appears that counsel believed Currin's profanity, though "vile," was an effective way to demonstrate the hatred Currin carries for his and Capote's mother and thus tended to emphasize just how traumatic their childhood was. As one court has observed, when a defendant is facing the possibility of a death sentence, his counsel's attempt to "try talking the jury into a life sentence through the use of emotional testimony" is a reasonable trial strategy. Foster v. Strickland, 517 F. Supp. 597, 605 (N.D. Fla. 1981). Although another

attorney might have determined that Currin's profanity would do more harm than good for Capote, it was not objectively unreasonable for Capote's counsel to reach a different conclusion. See Stanley, 335 So. 3d at 23 (noting that "[t]here are countless ways to provide effective assistance in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way" (citation omitted)); and Duncan v. State, 461 So. 2d 906, 909 (Ala. Crim. App. 1984) (affirming the circuit court's finding that counsel's performance was not deficient, even though "another attorney might [have made] different choices or [chosen] different tactics"). Moreover, even if Currin's profanity did not "s[i]t well" with the jury, there is not a substantial likelihood that the jury's sentencing verdict would have been different if only the jury had not been exposed to his profanity. See Stanley, 335 So. 3d at 24 (noting that, to establish prejudice from counsel's deficient performance, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" and that "[t]he likelihood of a different result must be substantial, not just conceivable" (citations omitted)).

Based on the foregoing, the facts in Capote's petition, even if true, do not establish that his counsel performed deficiently during Currin's testimony, and, even if counsel's performance was deficient, Capote suffered no prejudice. Thus, summary dismissal of this claim was proper. See Miller, 1 So. 3d at 1078 (holding that summary dismissal was proper because the facts the petitioner pleaded, even if true, did not establish that his counsel had performed deficiently or that he had been prejudiced by the allegedly deficient performance); and Stallworth, 171 So. 3d at 79 ("A trial court may summarily dismiss a post-conviction petition [on a claim of ineffective assistance of counsel] when it is clear upon the face of the petition itself … that there are no facts upon which the petitioner could prevail." (citation omitted)).

2.

Capote's sixth ineffective-assistance-of-counsel claim alleged that his counsel failed to call Jenny Manuel to testify during the penalty phase. When Capote was 19 years old, he lived with Manuel and her family for several months because he was otherwise homeless. According to Capote, Manuel would have testified that Capote "was essentially a nanny" for her two young children, that he "cared for [the children's]

41

needs," and that the children "came to love him." (C. 17.) Capote alleged that those facts "would have made a powerful impression" on the jury by "provid[ing] proof of [his] nurturing side" (id.), and he alleged that, without Manuel's testimony, the State "succeeded in portraying him as a remorseless murderer who had a complete lack of respect for the lives of others." (C. 18.)

Initially, we note that "'[a] trial counsel's choice of whether to call witnesses is generally accorded a presumption of deliberate trial strategy and cannot be subject to second-guessing in a claim of ineffective assistance of counsel.'" Stallworth, 171 So. 3d at 73 (quoting Saylor v. Commonwealth, 357 S.W.3d 567, 571 (Ky. Ct. App. 2012)). We also note that Manuel's testimony would have been cumulative of the testimony provided by Dr. Marianne Rosenzweig, a forensic psychologist who testified for the defense. Specifically, Dr. Rosenzweig testified that Capote was "like a nanny" for Manuel's family in that he "would cook dinners for [them], he cleaned the house, he did laundry, [and] he took care of her kids"; that he "became like a part of the family"; and that Manuel's children viewed him as an uncle. (R. 1710.) As this Court has repeatedly stated: "'[F]ailing to introduce additional mitigation evidence

42

that is only cumulative of that already presented does not amount to ineffective assistance.'" <u>Walker v. State</u>, 194 So. 3d 253, 288 (Ala. Crim. App. 2015) (quoting <u>Jalowiec v. Bradshaw</u>, 657 F.3d 293, 319 (6th Cir. 2011)). Thus, because Manuel's testimony would have been cumulative of Dr. Rosenzweig's testimony, summary dismissal of this claim was proper. See <u>Peraita v. State</u>, [Ms. CR-17-1025, Aug. 6, 2021] ___ So. 3d ___, ___ (Ala. Crim. App. 2021) (holding that summary dismissal was proper because "the proposed testimony [that counsel allegedly should have presented] was cumulative to other evidence presented at trial").

We acknowledge Capote's allegation that his counsel should have called Manuel to testify, despite the cumulative nature of her testimony, because, according to Capote, "[i]t is well established that lay witnesses – family and others who know the defendant well – are more effective as mitigation witnesses than 'experts.'" (C. 18.) However, decisions regarding "'[w]hich witnesses to call … are clearly trial strategy,'" <u>Clark v. State</u>, 196 So. 3d 285, 315 (Ala. Crim. App. 2015) (quoting <u>Ortiz v. State</u>, 866 S.W.2d 312, 315 (Tex. Ct. App. 1993)), and, despite his contention that he was asserting a well established principle, Capote cited no authority providing that a layperson is a more effective

mitigation witness than an expert. Instead, Capote cited the American Bar Association Guidelines – which are not authoritative, Ray v. State, 80 So. 3d 965, 982 (Ala. Crim. App. 2011) – and, moreover, the specific guideline he cited does not suggest that a layperson is a more effective mitigation witness than an expert. (C. 18.) Thus, we are unpersuaded by Capote's argument that his counsel performed deficiently in choosing to rely on an expert witness instead of a lay witness who would have presented the same mitigation testimony.

### 3.

Capote's seventh ineffective-assistance-of-counsel claim alleged that his counsel failed to ensure that his stepfather, Conrad Mathias, testified during the penalty phase. Capote noted in his petition that his counsel had arranged for Mathias to testify but that Mathias had ultimately "backed out" because "[s]peaking positively about Capote with Freeman's family in the courtroom made him uncomfortable; he felt for their loss." (C. 18-19.) According to Capote, his counsel should have "press[ed] upon [Mathias] the importance of appearing" but, instead, "did nothing to overcome [his] reluctance." (C. 19.) As to how Mathias's testimony could have benefited him, Capote alleged:

"Had Mathias testified, he would have helped humanize Capote for the jury. He saw Capote as a 'normal kid,' rambunctious and occasionally in trouble in school, but not a delinquent. Moreover, he would have discussed Capote's ADHD and how Ritalin seemed to help him slow down and focus. Most importantly, he would have offered firsthand testimony about Capote's mother and her gross failings as a parent. Their marriage dissolved, he would have testified, when Capote's mother put using drugs before [her] children and left drugs out openly in the dwelling."

(C. 19.)

However, Capote conceded in his petition that, "[i]f a witness declines to testify, a lawyer cannot generally be faulted" (C. 19), and the United States Supreme Court has held that competent representation "does not require an attorney to browbeat a reluctant witness into testifying." Knowles v. Mirzayance, 556 U.S. 111, 125 (2009). Indeed, a reluctant witness can actually serve as a liability to the defendant, especially when the witness has expressed sympathy for the victim's family, as Mathias did. Thus, the decision not to pressure a reluctant witness into testifying is an objectively reasonable trial strategy. See Guertin v. State, 243 Ga. App. 322, 323, 533 S.E.2d 159, 161 (2000) (finding no deficiency in counsel's decision not to call a witness to testify because counsel had determined that, "as a reluctant witness, any beneficial testimony that [she] could have provided might have been

45

offset with testimony that could hurt [the defendant's] case"); and Parker v. Bowersox, 94 F.3d 458, 461 (8th Cir. 1996) (holding that counsel's decision not to call an "extremely reluctant" witness "did not fall outside the wide range of professionally reasonable performance").

Moreover, according to Capote, Mathias would have testified that Capote was a "normal kid" who was "not a delinquent," that he had been diagnosed with attention-deficit/hyperactivity disorder ("ADHD"), and that Capote's mother had "put using drugs before [her] children and left drugs out openly in the dwelling." However, Dr. Rosenzweig testified that the people she interviewed, which included Mathias, had told her that Capote was a "pleasant child" who "showed respect to adults and … had no problems … minding them" (R. 1684), that he had been diagnosed with ADHD, and that his mother "would openly smoke marijuana in front of the kids," "used [cocaine] in front of the kids," and "was usually high when she was at home." (R. 1677-78.) Thus, Mathias's testimony would have been cumulative of Dr. Rosenzweig's testimony, and, as we have already noted, "[f]ailing to introduce additional mitigation evidence that is only cumulative of that already presented does not amount to ineffective assistance." Walker, 194 So. 3d at 288 (citation omitted).

46

Based on the foregoing, Capote failed to establish that his counsel performed deficiently by not coaxing Mathias into testifying. Thus, summary dismissal of this claim was proper. See Miller, 1 So. 3d at 1078 (holding that summary dismissal was proper because the facts the petitioner pleaded, even if true, did not establish that his counsel had performed deficiently); and Peraita, ___ So. 3d at ___ (holding that summary dismissal was proper because "the proposed testimony [that counsel allegedly should have presented] was cumulative to other evidence presented at trial").

4.

Capote's eighth ineffective-assistance-of-counsel claim alleged that his counsel failed to call Jeffrey Walker to testify during the penalty phase. According to Capote, Walker is a criminal-justice professor who, if called to testify,

> "would have explained that young people who feel marginalized or rejected – terms that apply squarely to Capote – turn to gangs for support; that a gang fosters a sense of belonging and can be a substitute family for a needy youth; and that gangs provide a way for young persons to gain respect and self-esteem, qualities that are often sorely missing from their lives."

47

(C. 20.) As to the prejudice he suffered in the absence of Walker's testimony, Capote alleged that the evidence of his gang affiliation, "presented without context, caused the jury to take a dim view of [his] character." (Id.)

We reiterate here that "[a] trial counsel's choice of whether to call witnesses is generally accorded a presumption of deliberate trial strategy and cannot be subject to second-guessing in a claim of ineffective assistance of counsel." Stallworth, 171 So. 3d at 73 (citation omitted). Furthermore, Dr. Rosenzweig provided testimony regarding Capote's reasons for joining the Almighty Imperial Gangsters. Specifically, after testifying to the harrowing events Capote experienced in his mother's house as a young child, Dr. Rosenzweig testified that Capote's mother "ended up kicking [him] out … when he was 14" years old and that he subsequently experienced intermittent periods of homelessness. (R. 1704.) Dr. Rosenzweig then testified as follows:

> "Q. Now, … between 14 and, say, 19, at some point [Capote] became involved in gang activity; is that correct?
>
> "A. That's true.
>
> "Q. First joined the Latin Kings?
>
> "A. That's correct.

"Q.    Tell us about that.

"A.    [Capote] was about 16 when he was – what they call it, he was jumped into the Latin Kings.  That meant that they basically beat him up for a period of time.  That's the right of initiation.  [Capote] told me that he had been homeless at this time, and the Latin Kings had kind of become like his family.  That they kind of looked out for him, and they took care of him.  And he didn't choose to go into the Latin Kings, but he was pretty sure that he was going to get initiated into the gang.  And, in fact, that is what happened when he was 16.

"Q.    And at some point he got away from them, is that right?

"A.    He did.  When he was 19, he elected to go into another gang called the Imperial Gangsters.  The reason he did that is that he said after he was initiated into the Latin Kings, they basically forgot about him.  They stopped treating him like a family member and just kind of let him do for himself.  And basically, kind of had him out there kind of making money for them.  And – but he knew some younger kids from his neighborhood that he kind of hung around with, and they were the Imperial Gangsters.  They – so he changed his gang affiliation because the Imperial Gangsters really did treat him like family and kind of look out for him.

        "But when he changed his affiliation, gangs of Chicago are sort of not the same as they are in Alabama.  This is – they are the real thing.  And a gang – when you join a gang, it's … for a lifetime.  You can't elect to get out of a gang.  And [Capote] said, but he knew that when he left the Latin Kings, he was marked to be killed by them.  And that he made the decision though at 19 to take that risk because he said he was homeless.  And living as a homeless person on the streets of Chicago, he

49

thought he would survive longer by joining the Imperial Gangsters and having somebody to kind of look after him basically like his own family than he would if he stayed just as a homeless person on the street."

(R. 1710-13.)

Thus, Dr. Rosenzweig's testimony indicated that Capote had turned to gangs for the support and sense of family that he had not previously experienced, which, according to Capote, would have been the purpose of Walker's testimony. In other words, Walker's testimony would have been cumulative of Dr. Rosenzweig's testimony, and, once again, "[f]ailing to introduce additional mitigation evidence that is only cumulative of that already presented does not amount to ineffective assistance." Walker, 194 So. 3d at 288 (citation omitted). Accordingly, summary dismissal of this claim was proper. See Peraita, ___ So. 3d at ___ (holding that summary dismissal was proper because "the proposed testimony [that counsel allegedly should have presented] was cumulative to other evidence presented at trial").

We note that Capote also alleged that

"[i]f called as a witness, Walker would have addressed these issues: Why someone joins a gang? What is expected of gang members? What is the significance of tattoos for someone in a gang or in prison? (Capote has noticeable facial tattoos that

might have alarmed the jurors.) And can someone change for the better while in prison?"

(C. 20.) However, this part of Capote's claim was nothing more than a list of issues that Walker allegedly would have addressed <u>without any indication as to what Walker's testimony would have been</u>. As this Court has explained, to properly plead a claim that counsel rendered ineffective assistance by failing to hire an expert witness, the petitioner must "'set out the testimony that the named expert would have given.'" <u>Wimbley</u>, ___ So. 3d at ___ (quoting <u>Brooks v. State</u>, 340 So. 3d 410, 437 (Ala. Crim. App. 2020)). Merely setting forth a list of questions that could have been presented to an expert witness, without any indication as to how the witness would have testified in response to the questions, is not sufficient to satisfy this pleading requirement.

5.

Capote's ninth ineffective-assistance-of-counsel claim alleged that Dr. Rosenzweig "was not properly prepared for cross-examination, and, as a result, her testimony did more to harm [him] than to help him." (C. 21.) In support of that claim, Capote alleged the following facts:

> "On cross-examination, the prosecutor got Dr. Rosenzweig to admit that Capote was a 'hellion' in kindergarten, where he kicked a teacher and attacked other

CR-20-0537

> students; that 'that [kind of] behavior has continued almost all of his life'; 'that he has a history of expressly violent behavior'; 'that if somebody mean mugs [Capote] . . . he [is] going to strike first'; that Capote was diagnosed with 'antisocial personality disorder'; and that the letter he wrote to [another gang member] in jail showed no remorse and 'fit the definition of a person with an anti-social personality disorder.' In almost all of these instances, the prosecutor asked a leading question – e.g., Capote was said to have a 'history of expressly violent behavior, right?' – and Dr. Rosenzweig answered 'Yes' or 'Correct' without explanation or push back."

(Id. (citations to record omitted).) According to Capote, "the prosecutor used the testimony elicited from Dr. Rosenzweig on cross-examination to paint a picture of [him] as person who could not control his anger." (Id.)

However, nowhere in his petition did Capote indicate what he believed his counsel should have done to better prepare Dr. Rosenzweig for cross-examination or how any further preparation would have impacted her testimony. In his brief to this Court, Capote argues that his counsel "could have anticipated what were obvious cross-examination questions and worked with Dr. Rosenzweig to give less damaging answers" (Capote's brief, p. 47), but the facts supporting an ineffective-assistance-of-counsel claim must be pleaded in the petition itself. See Bearden v. State, 825 So. 2d 868, 872 (Ala. Crim. App. 2001) ("Although Bearden attempts to include more specific facts regarding his claims of

52

ineffective assistance of counsel in his brief to this Court, those allegations are not properly before this Court for review because Bearden did not include them in his original petition before the circuit court."); and Bryant, 181 So. 3d at 1108 ("We note that Bryant alleges additional, and more specific, facts in his brief on appeal regarding this claim. However, these factual allegations were not included in his petition or amended petition; therefore, they are not properly before this Court for review and will not be considered."). Thus, Capote failed to plead this claim with the specificity required by Rule 32.3 and Rule 32.6(b), and summary dismissal of the claim was therefore proper. Shaw, 148 So. 3d at 764. See also Donald v. State, 312 Ga. App. 222, 229-30, 718 S.E.2d 81, 87-88 (2011) (affirming the denial of a claim that counsel had failed to adequately prepare the defendant for cross-examination because the defendant had made no "proffer showing how further preparation would have changed [his] testimony" (citation omitted)).

6.

Capote's tenth ineffective-assistance-of-counsel claim alleged that his counsel "fail[ed] to adequately investigate [his] mental-health issues," which, according to Capote, include "anxiety and depression," "PTSD-

related nightmares," and "mood instability." (C. 22-23.) Although Dr. Rosenzweig provided testimony to that effect (R. 1721), Capote alleged that his counsel should have also "engaged a psychiatrist to evaluate [him]" and that, had counsel done so, "the psychiatrist could have addressed [his] mental-health issues with medication and treatment." (C. 22.)

This claim was insufficiently pleaded, however, because Capote did not identify any psychiatrist his counsel should have "engaged." See Peraita, ___ So. 3d at ___ (holding that the petitioner's claim that his counsel "should have hired some other expert witness to assess his mental health" was insufficiently pleaded because he did not identify the expert "by name"); and Wimbley, ___ So. 3d at ___ (holding that the petitioner's claim was insufficiently pleaded because he "did not allege the name of any mental-health professional his counsel should have talked to"). Thus, because Capote failed to plead this claim with the specificity required by Rule 32.3 and Rule 32.6(b), summary dismissal of the claim was proper.[7] Shaw, 148 So. 3d at 764.

---

[7]Capote raised an eleventh ineffective-assistance-of-counsel claim in his petition, alleging that his counsel "fail[ed] to challenge the use of [his] prior felony as an aggravating circumstance." (C. 23.) We do not

Conclusion

Capote has not demonstrated that he is entitled to relief from the circuit court's summary dismissal of his Rule 32 petition. Accordingly, the judgment of the circuit court is affirmed.

AFFIRMED.

Windom, P.J., and Kellum and Minor, JJ., concur. Cole, J., concurs in the result.

---

consider that claim, however, because Capote has not reasserted it on appeal, and it is thus deemed abandoned. Brownfield, 266 So. 3d at 795 n.8.